[Crim. No. 9370. Fourth Dist., Div. Two. May 18, 1977.]

In re RONALD S., a Minor, on Habeas Corpus.

**COUNSEL**

Frank L. Williams, Jr., Public Defender, and Michael E. Ward, Deputy Public Defender, for Petitioner.

Cecil Hicks, District Attorney, Michael Capizzi, Assistant District Attorney, Oretta D. Sears and Eric Snethen, Deputy District Attorneys, for Respondent.

**OPINION**

**GARDNER, P. J.**—In this case we are called upon to review the well-intentioned efforts of the Legislature to afford justice in the juvenile court to the so-called status offender[1] and to the equally well-intentioned efforts of a juvenile court judge to deal with certain unanticipated problems resulting from that legislative effort. We conclude that the effort of each was disastrous. Unhappily, in explaining our reasons for reaching this conclusion, it becomes necessary to inflict upon the reader an unconscionably long opinion. Some situations simply do not lend themselves to brevity.

### BACKGROUND

To the cynic it might appear that no legislative session would be complete without a thoroughgoing and often confusing revision of the juvenile court law. Tested by those standards, that same cynic would

---

[1] A status offender might be defined as one whose only offense against society is doing something that would not be legally prohibited if done by an adult. The status offender is defined in section 601 of the Welfare and Institutions Code.

pronounce 1976 a vintage year. However, to the serious student of the Juvenile Court Law, such a blanket charge of legislative irresponsibility is unfair.

The Juvenile Court Law is, and has been, a battleground of divergent and often warring social and legal philosophies. On the one hand, we find those who believe thoroughly in the *parens patriae* philosophy of the original juvenile court law. On the other hand, we find those who believe that blind obedience to that philosophy and its resulting disregard of constitutional rights of young people has, in many respects, reduced the juvenile court to little more than a kangaroo court for young people. We also have a battle to the death between those who, at the risk of oversimplification, believe in the lock-the-kids-up-and-throw-the-key-away philosophy and those who, again at the same risk of oversimplification, insist that every underage criminal, no matter how vicious, is but a misguided child and is to be treated as such. These conflicts have, from time to time, resulted in a hodge-podge of legislation.

Between 1903, when California created its first juvenile court until the late 1950's, the juvenile court picture in this state had become a checkerboard of inconsistent practices and procedures varying from county to county and judge to judge. The law had become a jumble of amendments and amendments to amendments. In 1961, the Legislature enacted that which has become known as the 1961 Juvenile Court Law. This was indeed a legislative milestone. The 1961 law appeared to satisfactorily bridge the gap between the feuding social and legal philosophies. It was simple, workable, understandable and relatively uncomplicated. However, the handing down of certain United States Supreme Court decisions (*Breed* v. *Jones,* 421 U.S. 519 [44 L.Ed.2d 346, 95 S.Ct. 1779]; *In re Winship,* 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]; *In re Gault,* 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428]; *Kent* v. *United States,* 383 U.S. 541 [16 L.Ed.2d 84, 86 S.Ct. 1045]) necessitated certain changes in the law. (See Gardner, *Gault and California,* 19 Hastings L.J. 527.) As a result, each legislative session since 1961 has resulted in some legislative tinkering with the basic law. Also, the 1976 offering appears to have been a major effort aimed at a reconciliation between the competing social and legal forces and theories. While it has many interesting facets, we address ourselves but to one—the handling of the status offender under the 1976 law.

## THE STATUS OFFENDER

Everyone in the legal and judicial world is aware that the clientele of the juvenile court is divided, as was Caesar's Gaul, into three parts —Welfare and Institutions Code sections 600, 601 and 602. (Hereafter all code sections are those of the Welfare and Institutions Code unless otherwise designated.)

Section 600 covers dependent children—the victims of cruelty, abuse, neglect or depravity. No serious conflict exists as to the legislative and judicial handling of these tragic victims of social forces beyond their control. (All sections pertaining to dependent children have been renumbered in the 1976 law and now are in the 300 category.)

Section 602 covers underage law violators. Real conflicts still rage as to the proper handling of this category of minors. The 1976 legislation addressed itself at length to the problem. However, a judicial review of these changes must wait for another court and another day.

Section 601's have always been a major headache to the juvenile court. They fall between the chairs, so to speak. They are not the dependent children who are clearly entitled to the full protection of the juvenile court. Neither are they law breakers entitled to whatever firm or lenient treatment the law or individual judge feels appropriate for such offenders. For years, there has been widespread unease with the problem of the 601.

### CRITICISM OF THE PRE-1976 LAW

(A) Overbreadth.

As originally enacted the all-encompassing and vaguely defined sweep of the law was somewhat disturbing. As originally written, section 601 covered a multitude of sins plus considerable behavior which the most strait-laced individual would have difficulty defining as sinful. Included within 601 were:

(1) The incorrigible.

An incorrigible is defined as a minor who persistently or habitually refuses to obey the reasonable and proper orders and directions of a parent or guardian or who is beyond the control of that parent or guardian.

(2) The truant.

(3) The curfew violator.

(4) And that greatest of all catchalls ". . . one who for any cause is in danger of leading an idle, dissolute, lewd or immoral life." Judicial history does not record that anyone ever beat that rap. A saint would have difficulty avoiding jeopardy under that provision during any given 24-hour period.

As a result of all of this overbreadth, the juvenile court often found itself acting as a glorified babysitter, a woefully inadequate substitute parent, a frustrated judicial truant officer, a reluctant enforcer of curfew laws which were often of doubtful validity, the involuntary warden of institutions crammed with fleet-footed but unsuccessful runaways and the guardian of the sexual mores of a large group of uncooperative young ladies who allegedly were in danger of leading idle, lewd, dissolute or immoral lives when they came into court and were not much better off when they left.

The 601 was a judicial nightmare. He resented being in court. He had violated no law. He usually just did not get along with his parents and, when one met the parents, this was often completely understandable. He was often severely maladjusted presenting bleak hope of effective treatment. Just as often he was a time-consuming minor nuisance some inadequate parent was trying to fob off on the court. While service in the juvenile court is one of the most challenging and rewarding of judicial services, it is often a most frustrating experience—particularly with 601's.

(B) The intermingling of 601's and 602's.

Under the pre-1976 law, both 601's and 602's were wards of the court (as distinguished from dependent children who were always rigidly segregated) and were detained in and often committed to the same institutions. Thus, the youngster whose only offense against society was that he could not get along with his parents, found himself cheek by jowl with the underage rapist, robber or heroin peddler.

(C) Bootstrapping.

One of the most persistent complaints about the pre-1976 law was the ease with which a 601 could become a 602 and conceivably end up in the

CYA. The procedure went something like this: All dispositions available for a 602 were available for a 601 except one—commitment to the Youth Authority. This was reserved for 602's. However, it was quite simple for a 601 to become a 602 because one of the grounds for becoming a 602 was that after having been declared a 601 the juvenile "failed to obey a lawful order of the juvenile court." Thus, without breaking any law, a 601 could, by simply walking out of a foster home, become a 602 and could eventually be well on his way to the CYA.

Actually, the same thing could happen to a 600. For example, a 600 is taken from his parents because of their cruelty or depravity. He is often quite a disturbed youngster by the time the court gets him. So, he runs away from placement. This makes him a 601 because he is not obeying the reasonable directions of his foster parent. Again, he runs away from placement and thus becomes a 602 for failing to obey a lawful order of the court. Eventually, he could find himself in the Youth Authority for (1) being the victim of cruelty or depravity, and (2) not getting along with the system. Bootstrapping was a vicious practice.

## THE 1976 AMENDMENTS

The first thing the 1976 Legislature did was to cut down on the breadth of the law by deleting entirely from section 601 the ". . . from any cause in danger of leading an idle, dissolute, lewd or immoral life" provision. For the truant there is a new section—601.5—which established new procedures not here pertinent. As a result there is left under section 601 only the incorrigible and curfew violator. Thus, overbreadth was corrected.

The next thing it did was to preclude contact between 601's and 602's by providing that 601's were to be detained in or committed to only sheltered-care facilities in the community or crisis resolution homes. No longer were they to be detained in juvenile halls or committed to institutions with underage criminal offenders. (§§ 507, subds. (a), (b); 654; 727, subds. (a), (b), (c); Ops.Cal.Atty.Gen. (Jan. 18, 1977) CR 76-62 I.Letter)[2]

---

[2]We do not deem it essential to this opinion to set forth in toto sections 654 or 727, subdivisions (a), (b), (c), or (d). These sections may be found in the above opinion of the Attorney General. However, we do set forth in this footnote, section 507, subdivisions (a) and (b) as it existed at all times pertinent in this decision.

Section 507 provides:

"(a) No court, judge, referee, or peace officer shall knowingly detain in any jail or lockup any person under the age of 18 years, unless a judge of the juvenile court shall determine that there are no other proper and adequate facilities for the care and

Then to avoid the bootstrapping operation it removed from section 602 the proviso that one could become a 602 by violating an order of the court when a 601.

So far, so good. It appeared that the Legislature had faced up to its responsibilities admirably.

## THE 1976 PROBLEM

However, one small cloud, the size of a delinquent child's hand, immediately appeared on the judicial horizon.

In its zeal to afford treatment for 601's which would be removed from that available to underage criminals, the law provided that sheltered-care facilities and crisis resolution homes were not to be secure, i.e., they were not to be locked. The idea was that 601's were to be removed from the traditional juvenile court system and placed in community based service systems including temporary out-of-the-home care in open settings.

The trouble with this philosophy is that the 601's are often somewhat irresponsible, not to say nomadic. As a matter of fact, the overwhelming number of 601's are runaways. An immediate result of the 1976 amendment was that while the authorities were doing the preliminary paperwork at the front door of a nonsecure home for a runaway, the runaway was simply running away again out the backdoor. Placing a runaway in a nonsecure environment is something of an exercise in futility. To put it quite as succinctly as possible, 601's began to scatter like a covey of quail. As a result, the juvenile court judges of this state

detention of such person, or unless such person has been transferred by the juvenile court to another court for proceedings not under the juvenile court law and has been charged with or convicted of a felony. If any person under the age of 18 years is transferred by the juvenile court to another court and is charged with or convicted of a felony as herein provided and is not released pending hearing, such person may be committed to the care and custody of a sheriff, constable, or other peace officer who shall keep such person in the juvenile hall or in such other suitable place as such latter court may direct, provided that no such person shall be detained in or committed to any hospital except for medical or other remedial care and treatment or observation.

"(b) Notwithstanding the provisions of subdivision (a), no minor shall be detained in any jail, lockup, juvenile hall, or other secure facility who is taken into custody solely upon the ground that he is a person described by Section 601 or adjudged to be such or made a ward of the juvenile court solely upon that ground. If any such minor is detained, he shall be detained in a sheltered-care facility or crisis resolution home as provided for in Section 654, or in a nonsecure facility provided for in subdivision (a), (b), (c), or (d) of Section 727."

We are advised that Assembly Bill No. 958 is presently in the Legislature's hopper. That bill adds a subdivision (c) to section 507 which provides in substance that under certain circumstances, a 601 may be detained in a secure facility.

lost control of the situation and as an inevitable result, parents, police and the public became increasingly irate.

## JUDGE VINCENT'S SOLUTION

Judge Raymond Vincent, one of the finest juvenile court judges in Orange County's history, faced with the above unfortunate turn of events made it a court policy that, when ordering a 601 detained at a crisis resolution home or sheltered-care facility, he was also ordered to stay put. Then when he did not, a petition was filed alleging a violation of Penal Code section 166, subdivision 4, contempt of court. This being a criminal offense, he was elevated to a 602 status and could then be securely placed in juvenile hall—for the time being at least.

■ All of which, at long last, brings us to Ronald S., a 13-year-old who had become a ward of the juvenile court under section 601. Sent to a crisis center[3] and ordered to stay there, he promptly left—the day he arrived. A petition under section 602 was filed—violation of Penal Code section 166, subdivision 4. The facts in the petition were found to be true and Ronald was ordered detained at the juvenile hall. By writ of habeas corpus he contests the 602 finding and his resulting incarceration in the juvenile hall.

## THE DECISION

Unfortunately, while we sympathize with Judge Vincent and thoroughly understand his problem and the impossible situation in which the 1976 legislation has placed him and all the other juvenile court judges in the state, we must disapprove his solution for the fleet-footed 601's. While it may seem ridiculous to place a runaway in a nonsecure setting, nevertheless, that is what the Legislature has ordained. The Legislature has determined that 601's shall not be detained in or committed to secure institutions even if this makes juvenile court judges look ridiculous. The

---

[3]Ronald takes issue with the determination that the crisis center in which he was detained was actually a crisis center within the concept of such institutions under section 507, subdivisions (a), (b). The facts are that, faced with an emergency situation, and having no crisis centers or sheltered-care facilities available, Judge Vincent simply removed the locks on the David R. McMillan School. This was originally the Orange County Juvenile Hall, but after a new juvenile hall was built in the 1960's, it became the David R. McMillan school and was used for short term commitments of 601's and 602's. Then, by removal of locks and judicial sleight of hand, it became the McMillan Reception Center—a crisis resolution home. However, in view of the eventual disposition of this matter, we decline to enter the controversy as to whether the McMillan Reception Center is actually a crisis resolution center. For our purposes, we will assume it is.

procedures established by Judge Vincent clearly are an inappropriate basis for a section 602 petition. If they were, a deletion of language in section 602 would become meaningless and we would simply revert to the bootstrapping operation again. The court would be doing by indirection that which cannot be done directly. As the law now stands, the Legislature has said that if a 601 wants to run, let him run. While this may be maddening, baffling and annoying to the juvenile court judge, ours is not to question the wisdom of the Legislature.

We must grant the petition for writ of habeas corpus.

However, before leaving this matter, we feel a responsibility to address ourselves to the subject of possible legislative reaction.

It appears to us that the Legislature must make a clear-cut decision in this field. We have no suggestions as to just what that decision should be but point out that the field apparently is limited to three alternatives.

First, the Legislature can decide that 601's are no business of the state and step out of the field entirely. This could be done on the basis that parent and child relationships are no concern of the state and in the case of an alleged incorrigible, parent and child are simply going to have to work out their problem without state help or intervention. A necessary corollary to this would be that if a youngster wants to run away from home, that is his business.

Second, the Legislature can decide that state intervention is desirable in these matters, remove the section 601 problem from the courts and place it in some other governmental agency which does not have the coercive power of a court. Thus, the state could provide facilities to which runaways would come voluntarily—where shelter, food, medical care, advice and counsel could be obtained. In other words, the state would maintain youth hostels with counselling services. However, once the state determines to do this, the juvenile court should be out of the picture because, as we will explain, it is intolerable to expect a court to administer such a program.

Third, if the Legislature determines that 601's are to remain under the protection of the juvenile court, section 507 must be amended to provide that in the proper case, a runaway may be detained in a secure setting. This could be done without the old procedure by which the minor could leapfrog into section 602 status. It could also be done without placing the

minor in contact with 602's, simply by providing that in some instances a sheltered-care facility or crisis center be a secure establishment. If the juvenile court is to be saddled with the responsibility for 601's, it must also be afforded the tools and authorities to handle those cases. Courts must have coercive authority or they cease being courts. A judge does not suggest to a defendant that he go to prison, he sentences him to prison. A judge does not ask a parent to support his child, he orders him to do so. When a judge gives a money judgment or other relief to a litigant, procedures exist for the enforcement of that judgment. It is simply not fair to a juvenile court judge to whom the community looks for help to so restrict him that he cannot put his orders or decisions into effect. Certainly not all 601's need to be placed in secure facilities. However, some do and in these cases the juvenile court judge must have the authority to detain in a secure facility—if 601's are to remain in the juvenile court.

Petition for writ of habeas corpus granted.

Tamura, J., and Kaufman, J., concurred.