422 A.2d 530

In the Interest of TASSEING H., a minor.

Appeal of TASSEING H., a minor.

COMMONWEALTH of Pennsylvania

v.

THERESA S., a minor, Appellant (at No. 301).

In re GLADYS H., a minor, Appellant (at No. 328).

In re JAMES S., a minor, Appellant (at No. 506).

Children and Youth Services, Participating Party.

Superior Court of Pennsylvania.

Argued Nov. 13, 1979.

Filed Oct. 10, 1980.

Petition for Allowance of Appeal Denied April 23, 1981.

Howard B. Elbling, Pittsburgh, for appellants at Nos. 148, 328 and 506.

George M. Janocsko, Allegheny County Sol., Pittsburgh, for Children and Youth Services, participating party at Nos. 148, 301, 328 and 506.

Charles W. Johns, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee at No. 301.

Before PRICE, HESTER and CAVANAUGH, JJ.

PRICE, Judge:

These appeals arise from the orders of the court of common pleas adjudicating four juveniles delinquent on the basis of acts found to be in contempt of court orders and placing them, pending disposition, in detention facilities designed for delinquent children. We are constrained to agree with appellants' assertion that under the provisions of

the Juvenile Act,[1] the juvenile court lacked a sufficient basis for finding them delinquent, and we therefore reverse the orders of the court of common pleas.

The history of the children involved in this appeal is illustrative of a frustrating problem faced by juvenile judges concerning the means to effectuate placement planning for dependent children[2] who openly defy the court by refusing to be available for psychological testing necessary to determine appropriate placement or absconding from nonsecure facilities in which they have been placed by order of the court. Tasseing, one of the juvenile appellants herein, was admitted to McIntyre Shelter[3] in the City of Pittsburgh by police officers following her refusal to return to her mother's home, from which she had run away two months prior to her apprehension. A dependency petition was filed by child youth services charging her with being a runaway and

1. Act of July 9, 1976, P.L. 586, No. 142, § 2 *et seq.* (42 Pa.C.S. § 6301 *et seq.*), effective June 27, 1978.

2. A dependent child is defined in 42 Pa.C.S. § 6302 as one who:
   "(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals;
   (2) has been placed for care or adoption in violation of law;
   (3) has been abandoned by his parents, guardian, or other custodian;
   (4) is without a parent, guardian, or legal custodian;
   (5) while subject to compulsory school attendance is habitually and without justification truant from school;
   (6) has committed a specific act or acts of habitual disobedience of the reasonable and lawful commands of his parent, guardian or other custodian and who is ungovernable and found to be in need of care, treatment or supervision;
   (7) is under the age of ten years and has committed a delinquent act;
   (8) has been formerly adjudicated dependent, and is under the jurisdiction of the court, subject to its conditions or placements and who commits an act which is defined as ungovernable in paragraph (6); or
   (9) has been referred pursuant to section 6323 (relating to informal adjustment), and who commits an act which is defined as ungovernable in paragraph (6)."

3. The term "shelter" is used to denote a physically unrestricted facility. 42 Pa.C.S. § 6302. Children are sent to McIntyre Shelter while awaiting placement.

incorrigible, and she was held at the shelter pending a hearing. Several days later, Tasseing ran away from the shelter, and when she failed to appear at the hearing scheduled in June of 1978, an attachment was issued for her arrest. Her whereabouts were not discovered until January of 1979, at which time a hearing was held. Judge Tamilia ordered that Tasseing be detained at Shuman Center, a secure facility designed for delinquent children, and that a delinquency petition be filed charging her with violation of a court order for running away from McIntyre Shelter. The judge further directed that an attempt be made to place Tasseing in the South Pittsburgh Day Treatment Program for delinquent children. For Tasseing to be placed in this program, it was necessary that she be committed to the Youth Development Camp at Warrendale under a delinquency adjudication and Judge Tamilia accordingly made the adjudication and commitment, but ordered that she remain at Shuman Center to be evaluated before placement. In February of 1979, Tasseing was committed to the day treatment program as a delinquent child.

Theresa, also among appellants herein, has been a ward of the court since 1962. She experienced trouble in her placement at Lutheran Children's Home and was subsequently placed in the Beaver County Children's Home. She ran away numerous times and was returned to the home, but a final episode of this behavior resulted in her apprehension and appearance before the juvenile court. A hearing was held before Judge Tamilia on January 10, 1979, and continued until February 7, 1979, to explore further placement. At the latter hearing, Theresa refused to return to the Lutheran Home or to go to the McIntyre Shelter and stated to the judge her intention to run away from wherever the court placed her. A delinquency petition was filed, upon the judge's direction, charging her with direct contempt for refusal to comply with a court order returning her to the Lutheran Home. She was placed by Judge Tamilia in Shuman Center until she later agreed to placement in a shelter facility and promised the judge that she would not

run away. The court deferred disposition on the petition and she was returned to the McIntyre Shelter. Within two days, she had run away again, and an attachment was issued seeking to have her returned to the detention center with further disposition deferred until her whereabouts were known.

Gladys, the third appellant herein, is a chronic runaway and truant, who was placed in McIntyre Shelter pending a hearing on a dependency petition. At the hearing on January 31, 1979, Judge Tamilia continued the hearing to have Gladys psychologically tested, and he ordered that she remain at the shelter pending the examination. Gladys, however, absconded from the shelter on February 2, but was returned. On February 9, while on a visit home to see her child, she ran away once more and, on her subsequent return home on February 15, refused to go back to the shelter. Judge Tamilia permitted her to remain at home when she promised not to leave there and to keep an appointment made for her testing. She failed to keep either of these promises and, as a result, was returned to the McIntyre Shelter. She ran away from the shelter several more times and Judge Tamilia finally adjudicated her delinquent on a petition charging her with violation of a court order to remain at the shelter. The judge placed her in Shuman Center pending a dispositional hearing, however, pursuant to a supersedeas issued by this Court, she was released from the detention home and placed in McIntyre Shelter with her assurance that she would remain there pending placement. Within two days of her arrival at the shelter, she again ran away.

James, the fourth appellant herein, was committed to the McIntyre Shelter pending his placement at Pressley Ridge School following a dependency adjudication on a petition filed because of his continual truancy. He ran away from the shelter twice and was returned to Shuman Center after the second runaway. Upon Judge Tamilia's direction, he was charged with the delinquent act of violating the court's order committing him to the McIntyre Shelter. He re-

mained at the detention home pending a hearing, which was held on February 7, 1979. Judge Tamilia deferred disposition of the delinquency petition in an attempt to effectuate placement pursuant to the dependency charge, and James was returned to Pressley Ridge School. He ran away again three times and was finally detained at Shuman Center. This appeal was filed challenging the orders placing him in Shuman Center pending his disposition, and subsequent to its filing, James was adjudicated delinquent and placed on probation in his parents' custody in a work and school program available only for delinquent children.

Thus, the general situation with which we are faced is as follows: appellant is brought before the court on a dependency petition; the court commits appellant to the McIntyre Shelter, a physically unrestricted facility, pending placement; and appellant subsequently runs away from the shelter; appellant is then apprehended and detained in Shuman Center, a detention home, while awaiting the filing of a delinquency petition charging contempt of court for violation of the court's commitment orders; finally, the court adjudicates appellant delinquent. We are confronted in this manner with a question of first impression in this Commonwealth—whether a child who absconds from shelter care ordered pursuant to a dependency petition may subsequently be found delinquent on the basis of contempt of court in violating a court order and, thereby, be detained or committed to facilities for delinquent children.

To be found delinquent, a child must have committed a delinquent act, which under the provisions of the Juvenile Act includes the following behavior:

"(1) The term means an act designated a crime under the law of this Commonwealth, or of another state if the act occurred in that state, or under Federal law, or under local ordinances.

(2) The term shall not include:

(i) the crime of murder; or

(ii) summary offenses . . . . " 42 Pa.C.S. § 6302.

This definition resulted from a determination by the legislature in 1977 that status offenders, those whose only offense against society was doing something that would not be legally prohibited if done by an adult, e. g., truancy or habitual disobedience, should not be classified as delinquent children. *Compare* Act of December 6, 1972, P.L. 1464, No. 333, § 2, *with* Act of August 3, 1977, P.L. 155, No. 41, § 1. The removal of status offenders from the delinquent category and their placement in the dependent category also prevents confinement of status offenders with delinquents because dependent children may not be committed to institutions operated for the benefit of delinquent children. 42 Pa.C.S. § 6351(b). Furthermore, a dependent child who is taken into custody prior to the commencement of proceedings or the hearing may only be detained, pending the hearing and disposition, in a shelter care facility and not in a secure detention home, as a delinquent child may be. 42 Pa.C.S. § 6327.

It is clear, therefore, that for appellants to be held pending their hearing in a secure facility like Shuman Center and ultimately to be found delinquent, the contempt for which they were cited must be found to be "a crime under the law of this Commonwealth." To make the determination of whether contempt is a crime that is contemplated by the wording of the Juvenile Act, we begin with an examination of the nature of contempt of court.

Contempt is divisible into two classes, civil contempt and criminal contempt, which are distinguishable primarily with regard to the dominant purpose and objective of the court's order. *Commonwealth v. Charlett*, 481 Pa. 22, 391 A.2d 1296 (1978); *Barrett v. Barrett*, 470 Pa. 253, 368 A.2d 616 (1977). If the purpose of the contempt citation is to vindicate the dignity and authority of the court and to protect the interests of the general public, then the citation is one for criminal contempt. If, however, the purpose of the citation is to coerce the contemnor into compliance with an order of the court to do or refrain from doing some act primarily for the benefit of private interests, the contempt is

classified as civil. *In re "B"*, 482 Pa. 471, 394 A.2d 419 (1978); *Commonwealth v. Fladger*, 250 Pa.Super. 36, 378 A.2d 440 (1977). Discerning the court's dominant purpose requires a functional analysis of the court's action, *In re "B", supra*, and the label with which the trial court chooses to refer to the contempt is not dispositive of whether it is civil or criminal. *Commonwealth v. Fladger, supra*. Although the concepts of remedial or coercive intentions and punitive intentions seem polar and quite distinct, the dividing line is sometimes quite obscure and indistinct, as the same conduct may amount to both civil and criminal contempt, *Brocker v. Brocker*, 429 Pa. 513, 241 A.2d 336 (1968), *cert. denied*, 393 U.S. 1081, 89 S.Ct. 857, 21 L.Ed.2d 773 (1969). We must keep our attention focused on the main purpose and not be misled by incidental results.

"It is true that either form of [sanction] has also an incidental effect. For if the case is civil and the punishment is purely remedial, there is also a vindication of the court's authority. On the other hand, if the proceeding is for criminal contempt and the imprisonment is solely punitive, to vindicate the authority of the law, the complainant may also derive some incidental benefit from the fact that such punishment tends to prevent repetition of the disobedience." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 443, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911).

■ To aid in the determination, our supreme court has delineated several criteria which indicate that the contempt is civil in nature: (1) the complainant is a private person as opposed to the government or a government agency; (2) the contempt proceeding is instituted between the original parties and entitled as part of the main cause, rather than as a separate, independent action; (3) the finding of contempt affords relief to a private party; (4) the relief requested is primarily for the benefit of the complainant; (5) the alleged acts of contempt are primarily civil in character and do not of themselves constitute crimes or conduct so contumelious that the court is impelled to act by its own motion. *Knaus*

*v. Knaus,* 387 Pa. 370, 127 A.2d 669 (1956), *cited in Kramer v. Kelly,* 265 Pa.Super. 58, 401 A.2d 799 (1979).

█ Several circumstances render analysis of the instant allegations of contempt particularly difficult. First, examination of the prosecution of the action, as suggested by the first criterion in *Knaus,* does not lead to a definite conclusion. The court in some sense initiated the contempt charges by ordering delinquency petitions to be filed against appellants on the basis of the acts of contempt, but the petition was actually filed by Children's Youth Services, a party to the initial cause involving dependency. Second, since these cases involve juveniles and the proceedings are pursuant to a delinquency petition, the designation of the action affords no help either. Furthermore, the fact that the court orders disposition upon the delinquency petition under the limitations imposed by the Juvenile Act, rather than imposing sanction directly on a contempt citation, means that we can only draw an analogy between the disposition and typical criminal or civil contempt sanctions. Despite these problems, we find that these contempts are properly classified as civil.[4]

█ The court's primary purpose in the instant circumstances was apparently a remedial one—to coerce appellants to remain in one place under the supervision of the court long enough to enable appropriate placement plans to be formulated and to permit treatment. The goal of the court was not simply punishment of these juveniles, as is evidenced throughout the transcripts and opinion in the expressed concern of the judge with their welfare. Indeed, a purpose to punish is beyond the function of a juvenile court judge whose *sole* function is a protective one seeking the treatment, reformation and rehabilitation of the children brought before him. *In re Garman,* 250 Pa.Super. 54, 378 A.2d 449 (1977). As we have previously discussed, the sanctions ordered by the court may, as a secondary effect,

4. We note that the juvenile court judge characterized these contempts as criminal ones but as stated previously, we are not controlled by that labelling.

vindicate its authority, but this should not control our determination.

Moreover, although several of the criteria enumerated in *Knaus v. Knaus, supra,* are not particularly enlightening in the instant circumstances, the final factor to be considered, the nature of the acts of contempt, does give us guidance and completely supports the classification of the instant contempt as a civil one. The acts supporting the findings of appellants' contempt were in all cases the same, leaving a nonsecure shelter facility without permission. These acts did not of themselves constitute offenses under the Crimes Code. The closest analogy would be to the crime of escape, 18 Pa.C.S. § 5121, an element of which is that a person unlawfully remove himself from "a facility for custody of those under charge or conviction of crime or alleged or found to be delinquent." 18 Pa.C.S. § 5121(e). Because appellants were merely classified as dependent children at the time they ran away from the shelter, a charge of escape would not lie against them. The acts, therefore, were civil in character and indicative that the contempt was civil in character as well.

Civil contempt does not partake of the nature of a crime, which has been generally defined as an act forbidden by law under pain of punishment. *Commonwealth v. Smith,* 266 Pa. 511, 109 A. 786 (1920); *Commonwealth ex rel. Miller v. Dillworth,* 204 Pa.Super. 420, 205 A.2d 111 (1964), *rev'd on other grounds,* 431 Pa. 479, 246 A.2d 859 (1968). In civil contempt, sanctions are not imposed to punish but rather to compel obedience, and thus, even though imprisonment may be imposed, the proceeding is not rendered a criminal one by such fact. The role of civil contempt and that of criminal laws also differs in that the first is primarily directed toward accomplishment of remedial purpose, generally affording relief to a private party, while the second seeks to protect a government institution and the enforcement of its mandates. Civil contempt, therefore, is clearly not a "crime under the law of this Commonwealth" and it cannot proper-

ly serve as the ground to support the filing of a delinquency petition or an adjudication of delinquency thereon.[5]

■ We are also convinced that even if the contempt findings made by the court in the instant case can be characterized as criminal contempt with the purpose of vindicating the authority of the court, adjudications of delinquency and detention and commitment as a delinquent are unfounded on the basis of this conduct because criminal contempt is not a "crime" as contemplated by the legislature in its definition of a delinquent act. Although a criminal contempt is quasi–criminal and in the nature of a crime because it inevitably contains an element of affront to the majesty of law, it is a "crime sui generis" and, in the instant circumstances, not to be fit into the mold of more commonplace offenses. *Commonwealth v. Mayberry*, 459 Pa. 91, 102, 327 A.2d 86, 91 (1974). *See Blackmer v. United States*, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932); *Myers v. United States*, 264 U.S. 95, 44 S.Ct. 272, 68 L.Ed. 577 (1924); *In the Interest of S.L.T.*, 180 So.2d 374 (Fla. Dist. Ct.App. 1965); *State ex rel. Oregon State Bar v. Lenske*, 243 Or. 477, 484, 407 P.2d 250 (1965), *cert. den.*, 384 U.S. 943, 86 S.Ct. 1460 16 L.Ed.2d 541 (1966).[6]

5. The label of civil contempt is most obviously applicable in Theresa's case. She was placed in detention but only until she agreed to placement and promised to cooperate by not running away, at which point she was released to shelter care. We are aware that orders in civil contempt proceedings must provide conditions, compliance with which will result in exoneration from the ordered sanctions, and that the instant orders confining appellants lacked express conditions. *Barrett v. Barrett*, 470 Pa. 253, 368 A.2d 616 (1977); *Philadelphia Marine Trade Ass'n v. Int'l Longshoremen's Assoc.*, 392 Pa. 500, 140 A.2d 814 (1958). Again we must note the limitations of this case in that the sanctions are imposed as a part of a delinquency disposition, and thus, we can only analogize to sanctions imposed directly upon a civil contempt citation.

6. Although in *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), the United States Supreme Court decided that a conviction for criminal contempt was not sufficiently different from an ordinary criminal conviction to justify denying a jury trial in serious contempt cases, the court did not deny the historical distinctions drawn between crimes and criminal contempts but made its decision on sixth amendment constitutional grounds.

Although our supreme court has stated on occasion that criminal contempt of court is a crime, *In re Cogan*, 485 Pa. 273, 401 A.2d 1142 (1979); *In the Matter of Johnson*, 467 Pa. 552, 359 A.2d 739 (1976); *Commonwealth v. Mayberry, supra*, these cases involved situations in which the contempt was based upon subsection III of the Act of June 16, 1836, P.L. 784, § 23, 17 P.S. § 2041.[7] That subsection involves contempt for misbehavior in the presence of the court that "obstruct[s] the administration of justice." Obstructing the administration of justice is, itself, an offense defined in the Crimes Code 18 Pa.C.S. § 5102. The instant contempts would fall into subsection II,[8] which permits the court to punish disobedience by parties to its lawful process, including formal orders necessary or resulting from the trial of lawsuits. *In the Matter of Johnson, supra.* This subsection involves no underlying crime from the Crimes Code, and the instant case, involving contempt predicated on the basis of that subsection, is of a different character than, and is distinguishable from, the cases cited earlier. Thus, even if we assume, arguendo, that the instant proceedings were for criminal contempt the underlying acts were not the type of crimes contemplated by the legislature in its definition of a delinquent act.

The determination that a juvenile's disobedience of the court's order subjecting him to shelter care is not a crime sufficient to support an adjudication of delinquency under the wording of the Juvenile Act is supported by an examination of the intent of the legislature, which manifests itself in the provisions of the Act. At the outset, we are mindful that our role in construing statutory provisions is well established and that a court may not alter, under the guise of construction, the express language and intent of the legislature. *Commonwealth v. Pope*, 455 Pa. 384, 317 A.2d 887 (1974). Instead, we must construe the statute, if possi-

7. The Act was repealed by the Act of April 28, 1978, P.L. 202, No. 53, § 2(a)[152], and reenacted in 42 Pa.C.S. § 4131.

8. 42 Pa.C.S. § 4132(s) (formerly 17 P.S. § 2041).

ble, to give effect to all its provisions, making the entire statute effective and certain. 1 Pa.C.S. §§ 1921(a), 1922(2).

As we examined earlier, the Pennsylvania General Assembly has clearly indicated its belief that status offenders would not benefit from treatment in the system provided for the care of delinquent children and should generally be kept separate from criminal juvenile offenders. *See* 42 Pa.C.S. §§ 6302, 6327, and 6351. Leaving a shelter care facility without authorization, *i. e.* running away, is symptomatic of the very problems which the legislature has deemed should be treated by care in an unsecured facility. A defendant child is defined in the Juvenile Act as one who commits acts of habitual disobedience and is ungovernable. 42 Pa.C.S. § 6302(6). It would be incongruous to classify a juvenile as delinquent for engaging in the same variety of conduct that under the Act constitutes him as being dependent. Indeed, under the definition of dependent child, 42 Pa.C.S. § 6302(8), the legislature apparently has anticipated the commission of acts at least analogous to the instant ones, and has provided that a child be adjudicated dependent and not delinquent for their commission. That section provides that if a child "has been formerly adjudicated dependent, and is under the jurisdiction of the court, subject to its conditions or placements and . . . commits an act which is defined as ungovernable in paragraph (6)," he will be classified as dependent. Thus, to permit a court to adjudicate a child delinquent on the basis of the acts presently in question through the use of the court's contempt power, would permit the court to accomplish indirectly that which it could not accomplish directly.

██ Moreover, this interpretation of the Juvenile Act is supported by an examination of the discordant results that would arise under the Act if we were to permit the acts herein to be classified as crimes, which would generally enable the court to commit the child to a secured shelter. The Act states that "[n]o child shall initially be committed to an institution for a period longer than three years or a period longer than he could have been sentenced by the

court if he had been convicted of the same offense as an adult, whichever is less." 42 Pa.C.S. § 6353(a). The punishment for criminal contempt is governed by 42 Pa.C.S. § 4132, which states that the punishment of imprisonment shall extend only to direct contempts [9] and that indirect contempts shall be punished by fine only.[10] Thus, since adults charged with analogous acts of contempt cannot be subjected to sentences of imprisonment, juveniles cannot lawfully be committed at all to a facility for delinquent children on the basis of this behavior.[11] This provision limiting the length of detention severely curtails the dispositions that may be made on a delinquency adjudication based on acts of contempt and also prevents the juvenile judge from accomplishing by this method its objective of vindication of the court's authority. Furthermore, the provisions of the Juvenile Act would permit these children, since they would be alleged delinquent to be *detained* in a secured facility pending a hearing and disposition. 42 Pa.C.S. § 6327. We find that this result is clearly inappropriate since it would permit the child to be held prior to adjudication in the same facilities that the legislature, through the Juvinile Act, had deemed unsuited to the best welfare of the child following a delinquency adjudication. We do not believe that the legislature intended that a child could be subjected to more severe restraints prior to proof that he committed a delinquent act than those to which he could lawfully be subjected

9. A direct contempt is one that occurs in the actual or constructive presence of the court; an indirect contempt is one that occurs beyond that presence, and consists of the violation of an order or decree of court. *Commonwealth v. Fladger*, 250 Pa.Super. 36, 378 A.2d 440 (1977). Tasseing, Gladys, and James were charged with indirect contempt in the petitions alleging their delinquency; Theresa was charged with direct contempt.

10. Two exceptions to this general rule, violation of a restraining order or an injunction issued by the court, are governed by 42 Pa.C.S. § 4132.

11. On this basis alone, the commitments of Tasseing to a day treatment program designed for delinquents and James to a work and school program for delinquent children were improper.

after proof of the act. These results lend support to our conclusion that the legislature did not intend that the instant acts be sufficient to support an adjudication of delinquency.

We sympathize with the well–intentioned efforts of the juvenile court judge to cope with the problems resulting from the revisions of the Juvenile Act removing status offenders from the ambit of a delinquency adjudication and providing for their separate treatment. However inconsistent it may seem to place a runaway in a non–physically restrained setting, the legislature has ordained that this is the manner of treatment to be employed, and we must abide by their judgment. The responsibility for action to cure the problem of devising an effective method of treating chronic runaways from shelter care lies with the legislature and not with this court.

> "So long as a statute is constitutional, the Legislature is the sole judge of its necessity or expediency and a court cannot refuse to enforce it on any ground that it is unjust, unwise, inexpedient, obsolete or contrary to any supposed policy or custom." *Amidon v. Kane*, 444 Pa. 38, 41, 279 A.2d 53, 55 (1971).

We conclude, therefore, that adjudications of delinquency do not lie on the basis of these contempt findings. As a consequence, appellants were improperly detained in Shuman Center, a detention facility in which they were physically restrained pending a hearing and awaiting examination for the purposes of placements, because under the provisions of the Juvenile Act, only an allegedly delinquent child may be detained in a detention home. Dependent children such as these must be detained in a shelter care facility. 42 Pa.C.S. § 6327(e).

The adjudications of delinquency and dispositions based thereon are hereby vacated as beyond the authority of the juvenile court, and these matters are remanded to the juvenile court for appropriate disposition.

CAVANAUGH, J., files a concurring statement.

HESTER, J., files a dissenting opinion.

## CAVANAUGH, Judge, concurring:

I conclude that violation by Appellants of the orders of the court below constitute criminal contempt. Such conduct, however, does not constitute a crime under the Juvenile Act and may not be the basis for an adjudication of delinquency. Accordingly, I concur in the result.

## HESTER, Judge, dissenting:

I respectfully dissent. I would affirm on the excellent opinion of Judge Tamilia of the court below. In his 80-page adjudication Judge Tamilia sets forth the reasoning which gives the Juvenile Courts of this Commonwealth the authority to exercise sufficient restraint over the juveniles involved to plan for placement, obtain necessary evaluations and tests, and to convince said juveniles that there is authority sufficient to act as a deterrent to their uncontrollable behavior. Judge Tamilia accurately describes the problem on page 80 of his opinion where he states:

"If this court cannot enforce its orders, the alternatives are clear. The malaise which effects this country in so many ways, which saps our will and points to a substantial decline in our culture and society, is no more evident than in our inability to do what is difficult and to some degree painful, to compel our children to accept education, routine discipline and authority. If the Court does not have the power to deal with this issue, then we will see a massive movement in Pennsylvania, as is already occurring to a fair degree elsewhere, to 'emancipate' children at sixteen so that they can obtain public assistance and begin their careers as drones who will never make a contribution to our society. Those under sixteen will, of course, have to 'make it' on the street however they can, until they too

can be 'emancipated' and be maintained by the public. The issue is not one of children's rights, but society's survival."

One of the major purposes of the Juvenile Act is to provide for the care, protection and wholesome mental and physical development of children coming within its provisions. By their frequent runaways and absences, the juveniles involved in this appeal were able to frustrate the Juvenile Court's fulfillment of this mandate.

The situation confronted by our Juvenile Courts was accurately evaluated by the California appellate court in *In Re: Ronald S.*, 69 Cal.App.3d 866, 138 Cal.Rptr. 387 (Cal.App. 1977), wherein the court stated:

"If the juvenile court is to be saddled with the responsibility for (status offenders), it must also be afforded the tools and authorities to handle those cases. Courts must have coercive authority or they cease being courts. A judge does not suggest to a defendant that he go to prison, he sentences him to prison. A judge does not ask a parent to support his child, he orders him to do so. When a judge gives a money judgment or other relief to a litigant, procedures exist for the enforcement of that judgment. It is simply not fair to a juvenile court judge to whom the community looks for help to so restrict him that he cannot put his orders or decisions into effect. Certainly, not all (status offenders) need to be placed in secure facilities. However, some do and in these cases the juvenile court judge must have the authority to detain in a secure facility—if (status offenders) are to remain in the juvenile court."

I would affirm.