v.

**STATE of Indiana, Appellee.**

**No. 2–1281A416.**

Court of Appeals of Indiana,
Third District.

July 27, 1982.

Susan K. Carpenter, Public Defender of Indiana, Frances L. Watson, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen. of Indiana, Stephen J. Cuthbert, Deputy Atty. Gen., Indianapolis, for appellee.

HOFFMAN, Presiding Judge.

W. M. was placed in the Marion County Guardian's Home in December of 1979 as a result of his appearance before the Marion Superior Court, Juvenile Division, for running away from home. On January 31, 1980, in answer to a petition alleging criminal contempt, W. M. admitted that he had violated the court's order by repeatedly leaving the Guardian's Home without permission.

The criminal contempt charge was combined with a pending runaway charge for purposes of disposition, and a hearing was ultimately held on March 24, 1980. In the interim, W. M. was held in detention. W. M. was awarded to the guardianship of the Department of Correction; however, the commitment was suspended and he was placed on probation and returned home with the special condition that he return to school and attend every class.

After returning home W. M. remained unable to control his behavior. On April 18, 1980 he again appeared in court to answer to a petition alleging he had violated the terms of his suspended commitment. He remained in detention until the disposition hearing on June 2, 1980. At that time the court revoked his suspended commitment and ordered him committed to the Department of Correction until he reached the age of 21, unless he is released sooner by the Department.

W. M. filed a petition for post-conviction relief, which was subsequently denied. At the time of the hearing on the petition, July 9, 1981, he was on parole from the Indiana Boys' School. However, since that time his parole has been revoked, and he is currently confined at the Indiana Boys' School.

W. M.'s appeal raises the same two issues which were raised in his petition for post-conviction relief:

(1) whether a juvenile adjudicated delinquent for criminal contempt for running away in violation of a court order may be given a disposition reserved for delinquents who have committed acts which would be crimes if committed by an adult, and

(2) whether a commitment imposed as a result of an adjudication of delinquency for criminal contempt may exceed three months.

Prior to 1976 the law in Indiana regarding juveniles remained essentially unchanged since the creation of the juvenile

court in 1905.[1] A runaway was a delinquent like any other delinquent and could be sent to the same facilities. A restriction was enacted by the General Assembly in 1976, prohibiting secure confinement of dependent and neglected children, with running away from home included in the definition of "dependent" children.[2] The new Indiana juvenile law which became effective in October of 1979 provided that noncriminal misbehavior could still result in a finding that the child was delinquent; however, those children could not be placed in secure facilities.[3] Indiana, by adopting the policy of deinstitutionalization of status offenders, like many other states, is moving in the direction of standards adopted by the ABA Juvenile Justice Standards Project. While removing status offenders from facilities used for law violators often results in better treatment and services for the child and the child's family, it has also presented some problems for juvenile courts. The one now before us is: What can a juvenile court do when faced with a recidivist status offender?

In deciding a case of first impression for our state, it is sometimes helpful to examine opinions from some other jurisdictions which have faced similar situations. The Supreme Court of Alaska addressed this problem in the case of *L. A. M. v. State* (1976) 547 P.2d 827. It held that the failure of a minor, a chronic runaway, to abide by court orders regarding her supervision constituted willful criminal contempt of the court's authority, and she was, therefore, properly declared a delinquent and subjected to the dispositions available to other delinquents. However, the court took great pains in drawing a distinction between the juvenile facility where L. A. M. could be placed and those where she could not.

> "We note that L. A. M.'s primary argument in this case is that as a child in need of supervision whose conduct from the inception of the case to the present has not changed, she may not be placed in a

closed setting, i.e. one where the doors may be locked. However, the cases upon which L. A. M. relies proceed to a different point, namely that the child should not be placed in a state training school. In Colorado, California, Illinois and New York,[25] children in need of supervision can at the first instance be placed in juvenile halls or youth centers, i.e. places with locked doors, but cannot be placed at the state training school, i.e. maximum security institutions. The McLaughlin Youth Center in Anchorage is more the equivalent of a juvenile hall than it is a state training school. It should be noted that Alaska has contracts with Colorado and California to place Alaska delinquents who are too sophisticated for McLaughlin in the state institutions in those states. Thus L. A. M. is not to be placed at either the California or Colorado training schools; she is threatened with placement at the McLaughlin Youth Center.

> "Substantial evidence was introduced during the many hearings of this case regarding the population at the McLaughlin Youth Center. Based upon that evidence, it is clear that the kind of children who are extremely agressive [sic], and extremely hardened in delinquency, are not treated at McLaughlin Youth Center but are sent outside for placement at schools in Colorado and California under contract with the State of Alaska. While the population at McLaughlin is made up at the present time exclusively of 'delinquents,' the evidence introduced at trial convinces us that while delinquency in some form is a prerequisite to gaining admission to McLaughlin, it is not the real reason that the child is at McLaughlin. The overwhelming majority of delinquents with strong family ties are treated in the community. Those delinquents who end up at McLaughlin are by and large there for the same reason that L. A. M. may be

1. Teitelbaum, *Jurisdiction Over Misbehaving Children and Their Parents Under the New Indiana Juvenile Law*, 54 Ind.L.J. 539 (1979).

2. Acts 1976, P.L. 129, § 6.

3. IC 1971, 31–6–4–1 and IC 1971, 31–6–4–16.

there, namely an unwillingness to remain at home or a home substitute and heed parental or a custodian's regulations. Based upon the evidence, it appears that L. A. M. and other chronic runaways would not be distinguishable in sophistication, exposure to criminal activity, etc., from the average child in the population at McLaughlin and that therefore the reasoning of the cases cited by L. A. M. should not apply to Alaska.

" 25. *In re Presley*, 47 Ill.2d 50, 264 N.E.2d 177 (1970); *Matter of Tomasita N.*, 30 N.Y.2d 927, 335 N.Y.S.2d 683, 287 N.E.2d 377 (1972); *C. v. Redlich*, 32 N.Y.2d 588 [347 N.Y.S.2d 51], 300 N.E.2d 424 (1973); Cal.Welf. and Inst.Code, §§ 601, 730, 777 (West 1972)." 547 P.2d at 835.

Unfortunately, Indiana does not have separate facilities for different levels of delinquency. Therefore, the solution provided by the Alaska court is not available to us.

Minnesota is another state which was forced to deal with the problem of repeat status offenders. In *State ex rel. L.E.A. v. Hammergren* (1980), Minn., 294 N.W.2d 705, the Supreme Court of Minnesota held that only under the most egregious circumstances should the juvenile courts exercise their contempt power in such a manner that a status offender would be incarcerated in a secure facility. In so holding, they qualified the result by adding:

"... If such action is necessary, the record must show that all less restrictive alternatives have failed in the past. (*See State in Interest of M. S.*, 73 N.J. 238, 374 A.2d 445 [1977] for other alternatives.)

"In *L.A.M. v. State*, 547 P.2d 827, 831 (Alaska, 1976), the Alaska Supreme Court noted:

Before a party may be held in criminal or civil contempt for failure to abide by a court order, certain elements must be established: (1) the existence of a valid order directing the alleged contemnor to do or refrain from doing something and the court's jurisdiction to enter that order; (2) the contemnor's notice of the order within sufficient time to comply with it; and in most cases, (3) the contemnor's ability to comply with the order; and (4) the contemnor's willful failure to comply with the order.

"In order for the juvenile court to find a 'willful failure to comply' which warrants a holding of contempt, the record from the previous hearing must show that the child understood that disobedience would result in incarceration in a secure facility. A child too young to comprehend the warning cannot be found in contempt of court. With these limitations, the juvenile court can resort to the use of the secure facility if absolutely necessary. *"Finally, if it is necessary to rely on the use of a secure facility, the order must include instructions to the administrator of the institution that the disobedient child's contact with the more committed juvenile be kept to a minimum."* (Emphasis added.)

294 N.W.2d at 707–708.

The same issue arose in Pennsylvania and was decided in the case of *In Interest of Tasseing H.* (1980) 281 Pa.Super. 400, 422 A.2d 530. The Superior Court of Pennsylvania decided that, "to permit a court to adjudicate a child delinquent on the basis of the acts presently in question through the use of the court's contempt power, would permit the court to accomplish indirectly that which it could not accomplish directly." 422 A.2d at 537. The Court went on to say:

"We sympathize with the well-intentioned efforts of the juvenile court judge to cope with the problems resulting from the revisions of the Juvenile Act removing status offenders from the ambit of a delinquency adjudication and providing for their separate treatment. However inconsistent it may seem to place a runaway in a non-physically restrained setting, the legislature has ordained that this is the manner of treatment to be employed, and we must abide by their [sic] judgment. The responsibility for action to cure the problem of devising an effective method of treating chronic runaways from shelter care lies with the legislature and not with this court."

422 A.2d at 537–538.

The California Court of Appeal, Fourth District, granted a writ of habeas corpus to release a juvenile who was detained under the same theory as was used in the case before us. Judge Gardner was vehement in advising the state legislature to fill in this abyss which juvenile courts were faced with.

"Unfortunately, while we sympathize with Judge Vincent and thoroughly understand his problem and the impossible situation in which the 1976 legislation has placed him and all the other juvenile court judges in the state, we must disapprove his solution for the fleet-footed 601's. While it may seem ridiculous to place a runaway in a nonsecure setting, nevertheless, that is what the Legislature has ordained. The Legislature has determined that 601's shall not be detained in or committed to secure institutions even if this makes juvenile court judges look ridiculous. The procedures established by Judge Vincent clearly are an inappropriate basis for a 602 petition. If they were, a deletion of language in section 602 would become meaningless and we would simply revert to the bootstrapping operation again. The court would be doing by indirection that which cannot be done directly. As the law now stands, the Legislature has said that if a 601 wants to run, let him run. While this may be maddening, baffling and annoying to the juvenile court judge, ours is not to question the wisdom of the Legislature.

"We must grant the petition for writ of habeas corpus.

"However, before leaving this matter, we feel a responsibility to address ourselves to the subject of possible legislative reaction.

"It appears to us that the Legislature must make a clear-cut decision in this field. We have no suggestions as to just what that decision should be but point out that the field apparently is limited to three alternatives.

"First, the Legislature can decide that 601's are no business of the state and step out of the field entirely. This could be done on the basis that parent and child relationships are no concern of the state and in the case of an alleged incorrigible, parent and child are simply going to have to work out their problem without state help or intervention. A necessary corollary to this would be that if a youngster wants to run away from home, that is his business.

"Second, the Legislature can decide that state intervention is desirable in these matters, remove the 601 problem from the courts and place it in some other governmental agency which does not have the coercive power of a court. Thus, the state could provide facilities to which runaways would come voluntarily—where shelter, food, medical care, advice and counsel could be obtained. In other words, the state would maintain youth hostels with counseling services. However, once the state determines to do this, the juvenile court should be out of the picture because, as we will explain, it is intolerable to expect a court to administer such a program.

"Third, if the Legislature determines that 601's are to remain under the protection of the juvenile court, section 507 must be amended to provide that in the proper case, a runaway may be detained in a secure setting. This could be done without the old procedure by which the minor could leapfrog into 602 status. It could also be done without placing the minor in contact with 602's simply by providing that in some instances a sheltered-care facility or crisis center be a secure establishment. If the juvenile court is to be saddled with the responsibility for 601's, it must also be afforded the tools and authorities to handle those cases. Courts must have coercive authority or they cease being courts. A judge does not suggest to a defendant that he go to prison, he sentences him to prison. A judge does not ask a parent to support his child, he orders him to do so. When a judge gives a money judgment or other relief to a litigant, procedures exist for the enforcement of that judgment. It is

simply not fair to a juvenile court judge to whom the community looks for help to so restrict him that he cannot put his orders or decisions into effect. Certainly not all 601's need to be placed in secure facilities. However, some do and in these cases the juvenile court judge must have the authority to detain in a secure facility—if 601's are to remain in the juvenile court." [4]

*In re Ronald S.* (1977) 69 Cal.App.3d 866, 138 Cal.Rptr. 387, at 392–393.

Indiana courts have been presented with other problems arising from oversights by the drafters of the juvenile code. For example, originally waiver of juvenile jurisdiction was permitted in the statute for a ten or eleven year old charged with what would be murder if committed by an adult, yet the commitment of such a child to the Boys' School or Girls' School was not permitted. The Legislature recognized this inconsistency and modified IC 1971, 31–6–4–16 (Burns Code Ed.) to allow the placement of such children with the Department of Correction.[5]

Though not relied upon by the State, we feel compelled to address IC 1971, 31–6–7–15 which provides:

"Contempt.—The juvenile court may punish a person for contempt of court under IC 34–4–7 [34–4–7–1—34–4–7–10], IC 34–4–8 [34–4–8–1, 34–4–8–2], or IC 34–4–9 [34–4–9–1—34–4–9–3]. [IC 31–6–7–15, as added by Acts 1978, P.L. 136, § 1; 1979, P.L. 277, § 3.]"

This section must be examined in light of the legislative intent behind it and the other sections of the Juvenile Code.

The 1979 amendment substituted the present provision for one which read:

" '(a) The juvenile court may punish a person for contempt of court under IC 34–4–7, IC 34–4–8, or IC 34–4–9. However, if the contempt is for failure to obey an order under IC 31–6–6–14, the court may order the defendant imprisoned for up to one year.

" '(b) In proceedings under IC 31–6–6, any of the following persons may move the juvenile court to find the father in contempt for failure to comply with the court's support order:

'(1) The mother, guardian, or custodian of the child.

'(2) The county department, if the mother is receiving aid to families with dependent children.

"Whenever the father is found in contempt, the juvenile court may require him to pay reasonable attorney's fees for the plaintiff.' "

(Burns Code Annotated IC 31–6–7–15). This earlier section clearly was meant to cover adults since a juvenile court would not otherwise have jurisdiction over them.

Likewise IC 1971, 33–12–2–7, which provided:

"Administration of oaths—Contempt of court—Power to punish.—The said juvenile courts, respectively, shall have full authority to administer all necessary oaths, and to punish, by fine and imprisonment, or either, all contempts of their authority and processes in any matter before them, or by which the proceedings of the courts or the due course of justice is interrupted. [Acts 1945, ch. 347, § 7, p. 1647.]"

has since been repealed by Acts 1978, P.L. 136, § 57 and was included in the current IC 1971, 31–6–7–15. This directs us to another purpose behind IC 1971, 31–6–7–15, that is, to allow a juvenile court to control any disruptions of its proceedings.

IC 1971, 31–6–7–15 should not be used to accomplish the goal that the juvenile court in the instant case attempted. It is meant to allow the juvenile courts a means of keeping order in their courtrooms and grants them jurisdiction over adults in some circumstances. In light of the statutory prohibition of incarcerating juveniles whose acts are not crimes for adults, IC 1971, 31–6–7–15 cannot be used to incarcerate them when the underlying act is a status

---

4. A "601" is a status offender.

5. Acts 1980, P.L. 182, § 13, effective October 1, 1980.

offense. To find otherwise would place sections of the Juvenile Code in conflict with each other.[6]

It is clear that an underlying principle in the statutes governing the juvenile justice system is the belief by the Legislature that children whose adjudication of delinquency is for running away from home should not be placed in the Girls' School or Boys' School. Therefore, in view of the secure juvenile facilities which exist in Indiana and the law enacted by our Legislature, we must agree with other courts of the land. Juvenile courts cannot be permitted to accomplish indirectly that which they could not accomplish directly. Any change must come from the Legislature.

We recognize the dilemma faced by juvenile courts throughout the state in dealing with the nomadic children who are brought before them time and time again. Obviously, our Legislature has also been made aware of the problem. In the most recent session of the Indiana General Assembly, Senate Bill 59 was introduced and enacted. By Acts 1982, P.L. 184, § 1, subsection (m) was added to IC 1971, 31–6–4–16, the dispositional section, and clearly states:

"If: (1) a child is found to be a delinquent child because he has committed a delinquent act under section 1(a)(2) of this chapter;

(2) the child has previously violated a valid court ordered shelter care placement (with respect to a previous delinquent act under section 1(a)(2) of this chapter); and

(3) the child's physical and mental condition may be endangered if the child is not placed in a secure facility; the juvenile court may place him in a secure private facility for children licensed under the laws of any state (placement under this alternative includes authorization to control and discipline the child) or award wardship to the department of correction for housing in any correctional facility for children (such wardship does not include the right to consent to the child's adoption). Without a determination of unavailable housing by the department of correction, a child found to be a delinquent child under this subsection and placed in a secure private facility or the department of correction may not be housed with any child found to be delinquent under any other section of this chapter. The juvenile court shall retain jurisdiction over any placement under this subsection and shall review each placement every three (3) months to determine whether placement in a secure facility remains appropriate."[7]

This provision becomes effective September 1, 1982 and will provide a proper avenue by which a juvenile court can place a repeated runner with the Department of Correction.[8]

Since we are reversing the juvenile court's judgment which placed W. M. in the Boys' School for criminal contempt, we need not address the second issue which he raises.

Reversed.

GARRARD and STATON, JJ., concur.

---

**6.** It should also be noted that IC 1971 31–6–7–15 provides for contempt *pursuant to* IC 34–4–7, IC 34–4–8, or IC 34–4–9, and IC 34–4–76 provides that punishment by incarceration is limited to a term of three months.

**7.** "[S]ection 1(a)(2)" refers to IC 1971, 31–6–4–1(a)(2);

"A child commits a delinquent act if, before his eighteenth birthday, he: (2) leaves home without reasonable cause and without permission of his parent, guardian, or custodian who requests his return[.]"

**8.** The correct citations for the authorities offered by counsel would aid us in quickening the appellate process.