957 A.2d 298 (2008)
In re K.K., A Minor, Appellant
In re K.K., A Minor Child
Appeal of K.K., A Minor Child, Appellant
In re K.K.
Appeal of K.K., Appellant.
Nos. 1304 Western District Appeal 2007, 1376 Western District Appeal 2007, 1377 Western District Appeal 2007.
Superior Court of Pennsylvania.
Submitted March 3, 2008.
Filed September 10, 2008.
*299 Susan J.S. Abramowich, Pittsburgh, for appellant.
Wendy Kobee, John T. McVay, Jr., Pittsburgh, and Darnel B. Rosario, for Allegheny *300 County Solicitor, Participating Party.
David Kunz, Participating Party, Pro Se.
Michelle LaChoppa, Participating Party, Pro Se.
BEFORE: FORD ELLIOTT, P.J., MUSMANNO and TAMILIA, JJ.

OPINION BY FORD ELLIOTT, P.J.:
¶ 1 In these consolidated appeals, K.K. ("appellant"), a minor, challenges (1) the order entered on June 13, 2007, issuing a warrant to locate appellant and detain him in the Shuman Juvenile Detention Center ("Shuman Center"); (2) the order entered on July 12, 2007, issuing a second warrant for appellant's apprehension and detention in Shuman Center; and (3) the July 18, 2007 order adjudicating appellant dependent pursuant to 42 Pa.C.S.A. § 6302(6), and denying appellant's request to release the July 12, 2007 warrant. After careful review, we dismiss the appeal from the June 13, 2007 order, vacate the July 12, 2007 order, and affirm the adjudication of dependency.
¶ 2 The facts and procedural history may be summarized as follows. On February 6, 2007, Pittsburgh Police Officer Colby Neidig filed a juvenile dependency petition on behalf of appellant's father, D.K. ("Father"). Father alleged that appellant was habitually disobedient and excessively truant. Father also believed that appellant experimented with drugs and alcohol. On March 5, 2007, Kids Voice was appointed guardian ad litem. On March 15, 2007, appellant appeared before a hearing officer who continued the dependency hearing until June 13, 2007. The hearing officer desired to give appellant an opportunity to comply with several conditions it incorporated into a court order, including daily school attendance, cooperation with Children Youth and Family ("CYF"), and participating in drug and alcohol assessment. Subsequently, on April 17, 2007, CYF filed a motion to advance the dependency petition to an earlier date and to transfer the case to a trial judge. CYF alleged that appellant was ungovernable in that he continued to defy Father and remained truant. On May 2, 2007, the juvenile court assumed control of the case and scheduled the dependency hearing for 8:30 a.m. on June 13, 2007.
¶ 3 Prior to the June 13, 2007 hearing, on May 14, 2007, the Allegheny County Department of Human Services ("DHS") prepared a supplemental report documenting appellant's excessive truancy,[1] antisocial behavior, including trespassing on school property and engaging in sex in abandoned homes, and noncompliance with his mental health therapy and Individualized Education Plan. The supplemental report also disclosed that appellant had absconded from Father's home following notice of CYF's motion to advance the dependency petition. On June 6, 2007, the juvenile court entered an attachment order directing appellant's apprehension and commitment to shelter care pending further court order. Appellant was apprehended and detained briefly at a Pittsburgh police station. Pursuant to the attachment order, CYF caseworker Arlene Rice went to retrieve appellant from the police station. Appellant refused to accompany Ms. Rice into shelter care, and during the ensuing 45-minute discussion, Ms. Rice reminded appellant of the June 13, 2007 hearing and advised him to contact *301 Kids Voice and speak with his attorney. Appellant failed to appear at the June 13, 2007 hearing; and following the hearing, the juvenile court issued a warrant directing appellant's commitment in the Shuman Center, a secure detention facility.
¶ 4 On June 15, 2007, appellant's guardian ad litem filed an emergency motion to vacate the June 13, 2007 warrant. The juvenile court denied the motion on June 18, 2007, observing that, based on his previous conversation with Ms. Rice, appellant received actual notice of the dependency hearing. Later, on July 2, 2007, appellant appealed the June 13, 2007 warrant, and the June 18, 2007 order denying his motion to vacate at Docket No. 1304 WDA 2007. Next, on July 5, 2007, appellant filed an application to stay the June 13, 2007 warrant pending appeal to this court. The juvenile court denied the application on July 6, 2007. Thus, the warrant remained active.
¶ 5 Thereafter, at approximately 12:46 a.m. on July 12, 2007, appellant was apprehended, and he was detained in the Shuman Center pending a 9:00 a.m. detention hearing before the juvenile court. During the detention hearing, the juvenile court vacated the underlying contempt order because appellant promised to accompany Ms. Rice to CYF shelter care. However, later that day, appellant absconded, yet again, and the juvenile court immediately issued an attachment order and a second warrant for his contempt of court.[2] On July 26, 2007, appellant appealed the July 12, 2007, order issuing the second warrant at Docket No. 1376 WDA 2007.
¶ 6 Meanwhile, the underlying dependency action progressed to an evidentiary hearing on July 18, 2007. Again, appellant did not appear. The court denied appellant's request to defer the dependency adjudication; and following the evidentiary hearing, appellant, in absentia, was adjudicated dependent. Additionally, the juvenile court denied appellant's request to release the previously issued warrant. On July 26, 2007, appellant filed a timely appeal from the adjudication of dependency at Docket No. 1377 WDA 2007. On August 10, 2007, we consolidated the three interrelated appeals at Docket Nos. 1304 WDA 2007, 1376 WDA 2007, and 1377 WDA 2007 sua sponte.[3] Appellant's present location is unknown.
¶ 7 Appellant presents the following questions for our review:
1. Whether, during a dependency proceeding under the Juvenile Act, the juvenile court abused its discretion and erred as a matter of law in issuing an order for the arrest and confinement of a non-delinquent in a secure detention facility in violation of 42 Pa.C.S.A. §§ 6327(e) and 6351(c)?
2. Whether, during a dependency proceeding under the Juvenile Act, the juvenile court abused its discretion *302 and erred as a matter of law in holding a non-delinquent child in direct criminal contempt and issuing bench warrants for the arrest and detention of the child for failing to appear at a dependency hearing for which no proper notice, summons, subpoena or other order were ever provided as required under the Juvenile Act and the Rules of Juvenile Court Procedure?
3. Whether, during a dependency proceeding under the Juvenile Act, the juvenile court violated the due process rights of a non-delinquent child who was held in direct criminal contempt, arrested and ordered to be detained in a secure detention facility for failing to appear at a dependency hearing for which no proper notice, summons, subpoena or other order were ever provided as required under the Juvenile Act, the Rules of Juvenile Court Procedure, and the state and federal constitutions?
Appellant's brief at 5.[4]
¶ 8 Our scope and standard of review in dependency cases is well settled:
[W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination as opposed to the findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.
In re C.M., 882 A.2d 507, 513 (Pa.Super. 2005).
¶ 9 At the outset, we observe that the appeal from the juvenile court's June 13, 2007 order issuing a warrant for appellant's failure to appear at the hearing is moot because the juvenile court subsequently vacated that warrant upon appellant's apprehension on July 12, 2007, and his promise to accompany Ms. Rice to shelter care. See In re D.A., 801 A.2d 614, 616 (Pa.Super.2002) (explaining that an issue is moot if, in ruling upon issue, court cannot enter order that has any legal force or effect). Similarly, to the extent appellant sought to challenge the juvenile court's order denying his emergency motion to vacate the June 13, 2007 warrant, that issue also is moot. Id. Accordingly, we dismiss Docket No. 1304 WDA 2007 as moot.
¶ 10 We emphasize that the finding of contempt that is relevant to our review of the case-at-bar relates specifically to appellant ignoring the attachment orders and absconding from CYF custody immediately after the July 12, 2007 hearing. However, appellant's brief draws no distinction between the two contempt orders of June 13, 2007 and July 12, 2007 and their concomitant warrants. A significant portion of appellant's argument challenges the propriety of the contempt findings because the juvenile court allegedly failed to issue proper notice, summons, or subpoena to appear at the underlying dependency hearing on June 13, 2007. However, as noted *303 supra, appellant's failure to appear at the prior hearing is not at issue herein because the court subsequently vacated that warrant after appellant was apprehended and brought before the juvenile court on July 12, 2007. Thus, we do not review appellant's complaints relating to allegedly improper notice of the prior hearing.
¶ 11 We also observe that appellant's argument on appeal no longer challenges the propriety of the July 18, 2007 dependency adjudication. Accordingly, that issue has been abandoned. In re Jacobs, 936 A.2d 1156, 1167 (Pa.Super.2007) (issue waived because appellant did not address it in argument section of appellate brief). Thus, we affirm the juvenile court's July 18, 2007 adjudication of dependency at Docket No. 1377 WDA 2007.
¶ 12 Next, we address the appealability of the July 12, 2007 order that is the basis of the remaining appeal assigned Docket No. 1376 WDA 2007, and find that the order is appealable. This court may examine appealability sua sponte because it affects our jurisdiction over the matter. In re Estate of Fritts, 906 A.2d 601, 605 (Pa.Super.2006), appeal denied, 591 Pa. 673, 916 A.2d 1103 (2007). Appeals may be taken from, inter alia, a final order. See Pa.R.A.P. 341. An order of contempt is final and appealable when the order contains a present finding of contempt and imposes sanctions. Genovese v. Genovese, 379 Pa.Super. 623, 550 A.2d 1021, 1022 (1988); see also Takosky v. Henning, 906 A.2d 1255, 1258 (Pa.Super.2006) (observing, unless sanctions or imprisonment is imposed, order declaring party in contempt is interlocutory and not appealable).
¶ 13 Herein, the juvenile court's July 12, 2007 order issued the second warrant for appellant's apprehension and detention based upon appellant's alleged contempt of court in absconding from CYF's physical custody prior to entering shelter care. The juvenile court not only found that appellant was in criminal contempt for failing to satisfy the purge condition by accompanying CYF to shelter care but it also issued a warrant directing his apprehension and detention at Shuman Center based upon that finding. Accordingly, the July 12, 2007 order is final and appealable. Thus, we have jurisdiction to consider the appeal assigned Docket No. 1376 WDA 2007.
¶ 14 On appeal, appellant contends that the juvenile court erred in issuing the July 12, 2007 warrant because the Pennsylvania Juvenile Act ("Juvenile Act"), 42 Pa.C.S.A. §§ 6301-6358, prohibits placing non-delinquent children in a secured detention facility. This complaint does not challenge the juvenile court's authority to issue a warrant detaining appellant generally. Indeed, appellant concedes that the Juvenile Act authorizes the juvenile court to take custody of certain at-risk children. However, appellant asserts that the court erred in its determination of the location at which he may be detained. Appellant relies upon the Juvenile Act, prevailing public policy concerns, and the case law fashioned by a divided panel of this court in In Interest of Tasseing H., 281 Pa.Super. 400, 422 A.2d 530 (1980), for the proposition that a non-delinquent minor cannot be detained in a secured juvenile detention facility such as Shuman Center. (See appellant's brief at 14-18.) For all of the following reasons, we agree that the juvenile court's order violates the Juvenile Act.
¶ 15 The pertinent statutory provisions follow. Section 6325 of the Juvenile Act describes the following circumstances in which a juvenile may be detained:
A child taken into custody shall not be detained or placed in shelter care prior *304 to the hearing on the petition unless his detention or care is required to protect the person or property of others or of the child or because the child may abscond or be removed from the jurisdiction of the court or because he has no parent, guardian, or custodian or other person able to provide supervision and care for him and return him to the court when required, or an order for his detention or shelter care has been made by the court pursuant to this chapter.
42 Pa.C.S.A. § 6325. The act also identifies the locations an allegedly dependent juvenile may be detained.
A child alleged to be dependent may be detained or placed only in a Department of Public Welfare approved shelter care facility as stated in subsection (a)(1), (2) and (4), and shall not be detained in a jail or other facility intended or used for the detention of adults charged with criminal offenses, but may be detained in the same shelter care facilities with alleged or adjudicated delinquent children.
42 Pa.C.S.A. § 6327(e). Significantly, this provision of the Juvenile Act specifically omits subsection (a)(3) from its description of where a dependent child may be detained. Section (a)(3) relates to secured detention facilities for delinquent children. Id. In addition, section 6351(c), relating to disposition of dependent children, provides that "Unless a child found to be dependent is found also to be delinquent he shall not be committed to or confined in an institution or other facility designed or operated for the benefit of delinquent children." 42 Pa.C.S.A. § 6351(c).
¶ 16 Our review also requires an examination of this court's analysis in Tasseing H., wherein a divided three-judge panel of this court held that a juvenile court erred in adjudicating four dependent juveniles delinquent for, inter alia, absconding from a non-secure shelter facility, and placing them in secured juvenile detention facilities. The opinion announcing the result of the court reasoned, in part, that the Juvenile Act treats non-criminal "status offenders"[5] as dependents rather than delinquents. Tasseing H., supra at 536-537. The opinion continued that, since section 6327(e) did not provide that allegedly dependent juveniles could be detained in a secured facility, the court erred in detaining the juveniles in Shuman Center pending dependency placement. The majority held, "under the provisions of the Juvenile Act, only an allegedly delinquent child may be detained in a detention home. Dependent children ... must be detained in a shelter care facility." Id. at 538.
¶ 17 Although the concurring judge disagreed with the authoring judge's characterization of the contempt at issue, he did not challenge the author's rationale for prohibiting the allegedly dependent juveniles from being detained in secured facilities. Id. In contrast, the dissenting judge supported the juvenile court's decision to detain the juveniles, reasoning that the juvenile court has the authority to confront habitually ungovernable juvenile status offenders for their contemptuous conduct, and if required, detain them in a secured facility. Id. at 538-539.
¶ 18 With this background in mind, we address the propriety of the juvenile court's July 12, 2007 attachment order and warrant directing appellant's detention in Shuman Center. In reaching its decision to detain appellant in a secured facility pending a detention hearing, the trial court *305 reasoned that, in light of our subsequent decision in In Interest of Crawford, 360 Pa.Super. 36, 519 A.2d 978 (1987), and the 1980 amendments to the Juvenile Justice and Delinquency Prevention Act ("JJDPA"),[6] juvenile courts are empowered to exercise discretion to detain a non-delinquent child to ensure his or her safety and uphold the orderly administration of justice. (Trial court opinion, 10/16/07 at 11.) The juvenile court also referred to other jurisdictions that have either enacted a statutory framework, i.e., Virginia, or fashioned case law, i.e., California, whereunder a juvenile court is permitted to detain a non-delinquent juvenile. (Id. at 10-11.) Upon review of the facts in the case-at-bar, we find the juvenile court's decision to issue a warrant for appellant's detention was not authorized by the controlling precedent or the Juvenile Act and therefore is tantamount to legal error.
¶ 19 In Crawford, this court sought to distinguish the divided Tasseing H. court's holding, and it presented a well-reasoned analysis justifying the juvenile court's decision to commit a runaway juvenile to a secured detention facility. Essentially, the Crawford court reasoned that the Juvenile Act did not strip juvenile courts of their inherent powers to compel obedience to lawful orders. Id. at 979-980. The court continued that, to find that the juvenile court lacked authority to enforce its lawful order by detaining a willfully noncompliant, unsupervised juvenile "would render the court powerless and the procedures for achieving a `program of supervision, care and rehabilitation' meaningless." Id. at 980. The court also noted that subsequent to Tasseing H., Congress amended the JJDPA, which initially prohibited placing non-delinquent juveniles in secured facilities. As the Crawford court observed, the amendments permitted states to fashion a process for the detention of non-delinquent juveniles in circumstances where a valid court order has been violated. Id. at 981.
¶ 20 Crawford, however, is not dispositive of the case-at-bar. Although the court's reasoning clearly advocates the juvenile court's authority to detain a juvenile in a secured facility, under certain circumstances, without reference to whether the juvenile had been adjudicated delinquent, the juvenile in Crawford had previously been adjudicated delinquent. Hence, while the case is instructive of the precise question raised herein, its analysis of the relevant point is dictum.
¶ 21 In fact, appellant counters the juvenile court's reliance upon the Crawford court's reasoning by accurately pointing out that the Crawford analysis is dictum and noting that, unlike Congress's amendments to the JJDPA, the Pennsylvania General Assembly never amended the Juvenile Act to specifically permit the detention of non-delinquent juveniles in secured facilities. We are constrained to agree.
¶ 22 While we recognize that the amendments to the JJDPA reflected an obvious shift in public policy toward permitting the secured detention of non-delinquent juveniles, in certain limited situations, we also recognize that Pennsylvania jurisprudence still does not authorize that action. Notwithstanding the amendments to the JJDPA, our General Assembly has made it clear that juvenile status offenders are not to be detained in a secure facility. See 42 Pa.C.S.A. §§ 6327(e) and 6351(c). Moreover, unlike the other jurisdictions to which the juvenile court refers for support of its position, there is no statutory language *306 or case law authorizing this type of detention in Pennsylvania. Furthermore, we have found no evidence of legislative intent suggesting that the General Assembly intends to amend the Juvenile Act to permit secured detention of non-delinquent juveniles, even when the juvenile fails to obey a lawful court order. Indeed, mindful that the General Assembly declined to amend the Juvenile Act following the 1980 amendment to the JJDPA or clarify its legislative intent in response to the Tasseing H. court's interpretation of the relevant statutory provisions, we presume that this court's interpretation in that case continues to align with the legislative intent underlying the Act. See Commonwealth v. Mitchell, 588 Pa. 19, 72 n. 20, 902 A.2d 430, 462 n. 20 (2006), cert. denied, ___ U.S. ___, 127 S.Ct. 1126, 166 L.Ed.2d 897 (2007) (failure of the General Assembly to change the law which has been interpreted by courts creates presumption that interpretation was in accordance with legislative intent). Accordingly, we conclude the juvenile court lacked the authority to exercise its power of contempt by detaining a non-delinquent juvenile in a secured detention facility.
¶ 23 In reaching our conclusion, we recognize that this case illustrates the value of a system that would have permitted the juvenile court to detain appellant briefly in a secured facility until his settled placement in shelter care. Appellant is habitually disobedient and an inveterate truant who poses a danger to his own health and general welfare. Moreover, appellant repeatedly has demonstrated contempt for the very juvenile court that is attempting to protect him. Appellant's chronic, incorrigible behavior in the underlying proceedings epitomizes the precise concerns the dissent highlighted in Tasseing H., this court considered in Crawford, and Congress addressed in amending the JJDPA to permit secure detention in certain circumstances. Nonetheless, while the juvenile courts would benefit from a measure of authority to confront contemptuous juveniles whose interest they have been charged with protecting, it is not within this court's province to carve such an exception to the Juvenile Act's general prohibition against the secured detention of non-delinquent juveniles.
¶ 24 Having found that the Juvenile Act does not authorize the juvenile court to order appellant's detention in a secured facility, we vacate the juvenile court's July 12, 2007 order issuing a warrant for appellant's apprehension and detention in Shuman Center.
¶ 25 Appeal assigned Docket No. 1304 WDA 2007 dismissed. Warrant issued July 12, 2007 vacated, and July 18, 2007 dependency adjudication affirmed.[7] Jurisdiction relinquished.
¶ 26 Tamilia, J. files a Concurring and Dissenting Opinion.
CONCURRING AND DISSENTING OPINION BY TAMILIA, J.:
¶ 1 I write separately for purposes of addressing the General Assembly's treatment of the underlying issue in this case, and not for purposes of taking the Majority's analysis to task. I have reviewed the sparse legislative history behind the promulgation of 42 Pa.C.S.A. § 6325, Detention of child, and of 42 Pa.C.S.A. § 6327, Place of detention, (e) Detention of dependent child, and the various amendments to these provisions in conjunction with this Court's dispositions in both In Interest of Crawford, 360 Pa.Super. 36, 519 A.2d 978 (1987), and In Interest of Tasseing *307 H., 281 Pa.Super. 400, 422 A.2d 530 (1980) (Cavanaugh, J. concurring in the result) (Hester, J. dissenting). My research has not uncovered any inherent justification in the relevant statutory language and caselaw for upsetting the Majority's analysis. Section 6327(e) provides that status offenders "shall not be detained in a jail or other facility intended or used for the detention of adults charged with criminal offenses, but may be detained in the same shelter care facilities with alleged or adjudicated delinquent children." The phrase "or adjudicated" was added to section 6327(e) by the General Assembly in 2000. Nonetheless, and moving from the general to the specific, this phrase is still the object of the noun "shelter care facilities," which the Juvenile Act defines as "physically unrestricted" care. 42 Pa. C.S.A. § 6302, Definitions. The Act further provides that status offenders can be housed in the same shelter care facility as delinquents if the "children receiving shelter care services are segregated from the children receiving secure detention services...." Id.
¶ 2 There are times, however, when plain and unambiguous statutory language conflicts with pragmatic and constitutional concerns. I begin with words I penned over thirty years ago:
If th[e] court cannot enforce its orders, the alternatives are clear. The malaise which effects this country in so many ways, which saps our will and points to a substantial decline in our culture and society, is no more evident than in our inability to do what is difficult and to some degree painful, to compel our children to accept education, routine discipline and authority. If the Court does not have the power to deal with this issue, then we will see a massive movement in Pennsylvania, as is already occurring to a fair degree elsewhere, to `emancipate' children at sixteen so that they can obtain public assistance and begin their careers as drones who will never make a contribution to our society. Those under sixteen will, of course, have to `make it' on the street however they can, until they too can be `emancipated' and be maintained by the public. The issue is not one of children's rights, but society's survival.
Tasseing, supra at 538 (Hester, J. dissenting), quoting Trial Court Slip Op. at 80.
¶ 3 In 1974, the United States Congress passed the Juvenile Justice and Delinquency Prevention Act (JJDPA), 42 U.S.C. § 5601, et. seq. During the debates leading up to the passage of the JJDPA, I presented papers to the United States Congress arguing in favor of a "valid court order" exception to the proposed blanket prohibition against detaining status offenders in secure facilities. See Hon. Patrick R. Tamilia, In Search of Juvenile Justice: From Star Chamber to Criminal Court, 29 Akron L.Rev. 509, 521 (1996). Congress initially rejected my position, only to reverse course in 1980 to ensure that states which detain juveniles "who are charged with or who have committed a violation of a valid court order" in secure facilities do not lose eligibility for formula grants. 42 U.S.C. § 5633, State plans, (a)(11)(A)(ii), Requirements. The "valid court order" exception also has been adopted by large jurisdictions such as California, Ohio, and Virginia. See e.g., Cal.Code Civ. Pro. § 1219.5, Refusal of minor to testify; Referral to probation officer; Report and recommendation by probation officer; Placement of minor; Ohio Rev.Code Ann. § 2152.26(B), Place of detention; Va.Code Ann. § 16.1-292(a), Violation of court order by any person.
¶ 4 In 1982, the Pennsylvania Juvenile Court Judges' Commission endorsed *308 House Bill 1327, which would have allowed, inter alia, status offenders in contempt of a valid court order to be detained either in a delinquency facility or in a specially approved detention facility for dependents. I am of the hope this modest Concurring and Dissenting Opinion will help to end the decades old debate over the "valid court order" exception in a common sense fashion.
¶ 5 The Congressional "valid court order" exception was passed in the face of vehement opposition to the very notion that juveniles should ever be detained in secure facilities. See e.g., H.R.Rep. No. 96-946, at 24-25 (1980), reprinted in 1980 U.S.C.C.A.N. at 6111. Some of this opposition was prompted by valid concerns; no one would argue that a truant belongs in SCI-Rockview. Some of this opposition was hyperbole. I believe there is a middle ground between allowing the placement of status offenders in any secure facility for any reason, and allowing the placement of status offenders who are in violation of a valid court order in a secure facility where delinquents are being housedespecially in situations where it is possible for status offenders to be segregated from delinquents. Indeed, history has taught us that a balanced approach tailored to the individual needs of specific juveniles is the most effective method of dealing with the plague of juvenile deviance and violence:
[T]he juvenile court has seen itself evolve from a benevolent, child-centered concept, based on the 17th century doctrine of parens patriae, to a virtual return to the system it supplanted, the criminal court. At the extremes, the worst of both worlds has been inflicted upon the child, who has few advocates and is incapable of speaking for him or herself in the only manner that counts, through the political process based upon the power to vote.
Tamilia, J., 29 Akron L.Rev., supra at 509.
¶ 6 In this Commonwealth, and in American society at large, the specter of detention has been the focal point of the punitive and involuntary rehabilitative schematic since the 1790 construction of the Walnut Street Jail in Philadelphia. Every other punitive and involuntary rehabilitative mechanism, from probation to fines to court-ordered drug rehabilitation, derives its efficacy from this threat. In the instant matter, K.K. defied the June 6, 2007, attachment Order by refusing to accompany CYF to shelter care. K.K. then failed to appear for the June 13, 2007, dependency hearing. In response, the juvenile court issued a contempt Order and a warrant directing K.K. be committed to a secure facility. When K.K. was finally brought to task, the juvenile court agreed to vacate the underlying contempt Order if K.K. would agree to accompany CYF to shelter care. The absurdity of forcing a court to barter with a teenager should be enough in of itself to give one pause. K.K. abruptly violated the agreement, and the juvenile court was forced to issue a second contempt Order with an accompanying warrant on July 12, 2007. K.K. has refused to comply with three juvenile court directives. In my estimation, the July 12, 2007 Order addresses indirect criminal contempt, not mere civil contempt, inasmuch as the Order is necessary "to vindicate the dignity and authority of the court and to protect the interest of the general public." Commonwealth v. Ashton, 824 A.2d 1198, 1202 (Pa.Super.2003), citing Lachat v. Hinchliffe, 769 A.2d 481, 488 (Pa.Super.2001) (additional citation omitted); see also Tasseing, supra at 538 (Cavanaugh, J. concurring) (concluding a single act of absconding from shelter care *309 should be defined as criminal contempt).[8]
Indirect criminal contempt is a crime. Crozer-Chester Med. Ctr. v. Moran, 522 Pa. 124, 560 A.2d 133, 137 (1989). "Any criminal contempt is a crime in the ordinary sense: it is a violation of the law constituting a public wrong punishable by fine, imprisonment, or both." Ashton, supra at 1203, citing Diamond v. Diamond, 715 A.2d 1190, 1195 n. 6 (Pa.Super.1998); see also 42 Pa.C.S.A. § 4134, Commitment for failure to pay fine.
¶ 7 The status offender who is in criminal contempt cannot be found delinquent provided the contempt itself does not include a subsidiary offense which can be defined as delinquent or which can be certifieddue to the summary nature of criminal contempt offenses. See 42 Pa.C.S.A. § 6302, supra. Thus, there is no scenario in which such status offenders can be placed in a secure facility. The General Assembly's rationale in refusing to allow juvenile courts to hold status offenders in secure facilities is seemingly that "since adults charged with analogous acts of contempt cannot be subjected to sentences of imprisonment, juveniles cannot lawfully be committed at all to a facility for delinquent children on the basis of this behavior." Tasseing at 537. This rationale is unpersuasive, and not just for the obvious reason that adults in criminal contempt can be committed to prison. The placement of a status offender in a secured facility is not synonymous with a "sentence of imprisonment." The goals underlying such placements are "reformation and rehabilitation, as opposed to punishment and retribution." Commonwealth v. Dallenbach, 729 A.2d 1218, 1220 (Pa.Super.1999). Indeed, the General Assembly's rationale ignores the very nature of the juvenile system. This Court once explained:
Born at the end of the 19th century, the juvenile justice system was created with the lofty goal of saving, not punishing, of rehabilitating, not incarcerating, and of protecting, not penalizing our wayward children. Its birth sprang from the efforts of social reformers, who were concerned with the deleterious effects of sentencing juveniles to lengthy terms in adult prisons. The juvenile courts "aimed to check juvenile delinquency and to throw around a child, just starting, perhaps, on an evil course and deprived of parental care, the strong arm of the State acting as parens patrie."
In the Interest of K.B., 432 Pa.Super. 586, 639 A.2d 798, 800-801 (1994), overruled on other grounds by In the Interest of M.M., 547 Pa. 237, 690 A.2d 175 (1997). The idea that the juvenile system is a "parallel universe" for treating juveniles like we treat adults is at odds with both history and common sense. In the criminal justice system, courts are faced with fully-developed adults whose decision process is a creature of habit, and who are often unwilling to learn new behaviors. The at-risk status offender, on the other hand, is not fully-developed and can still be taught new behaviors.
¶ 8 K.K. does not attend school; he uses drugs and engages in inappropriate sexual *310 behavior; he is inadequate socially; he refuses to submit to mental health therapy; and he unabashedly ignores judicial directives. The General Assembly has left the juvenile court in a position where it is unable to compel K.K. to submit to treatment and, worse yet, is forced to convey the message that disobedience to the court and, as part of a larger paradigm, society at large will go unaddressed. The juvenile court not only is unable to deal with the issues K.K. presently faces, it is forced to help set the stage for what could be a greater tragedy. Pragmatism demands better.
¶ 9 From a purely legal perspective, the General Assembly's decision also raises constitutional concerns. Many years ago, our Supreme Court discussed the innate and long-standing authority of courts to address contempt.
All courts have this power, and must necessarily have it; otherwise they could not protect themselves from insult, or enforce obedience to their process. Without it, they would be utterly powerless. The authority to deal with an offender of this class belongs exclusively to the court in which the offence is committed; and no other court, not even the highest, can interfere with its exercise, either by writ of error, mandamus, or habeas corpus. If the power be abused, there is no remedy but impeachment. The law was so held by this court in M'Laughlin's Case (5 Watts 375), and by the Supreme Court of the United States in Kearney's Case (20 U.S. 38, 7 Wheat. 38, 5 L.Ed. 391). It was solemnly settled, as part of the common law, in Brass Crosbey's Case (3 Wils. Ind. 183), by a court in which sat two of the foremost jurists that England ever produced. We have not the smallest doubt, that it is the law; and we must administer it as we find it.
Passmore Williamson's Case, 26 Pa. 9, 18 (1855). In 1976, the innate authority of courts to punish contempt was re-codified by our General Assembly in the Judicial Act at 42 Pa.C.S.A. § 323, Powers. The power of the courts to punish contempt, like all powers, is checked by the General Assembly's authority to limit this power. Concomitantly, the General Assembly's power to punish contempt is also checked by the judiciary's authority to supervise the exercise of this power. See Commonwealth ex rel. Carcaci v. Brandamore, 459 Pa. 48, 327 A.2d 1, 5 (1974). Understandably, there are few cases in this Commonwealth's jurisprudence where the General Assembly's exercise of its authority in this regard was at issue. In Penn Anthracite Mining Co. v. Anthracite Miners of Pennsylvania, 318 Pa. 401, 178 A. 291 (1935), our Supreme Court addressed the question of whether the General Assembly had the constitutional authority to "grant the right to a jury trial to one charged with an `indirect criminal contempt for violation of a restraining order' and limit the punishment" that chancery courts could impose for such contempts. Id. at 293. In concluding the General Assembly did indeed possess this authority, the Court pointed out the statute under consideration was "narrow in scope" and "does not interfere with the power to deal summarily with contempts committed in the presence of the court or so near thereto as to obstruct the administration of justice, and is in express terms carefully limited to the cases of contempt specifically defined." Id. at 295.
¶ 10 At first glance, section 6327(e), supra, seemingly could be classified, as applied to cases such as the one at bar, as a lawful exercise of the General Assembly's power to limit the tools the judiciary has at its disposal for dealing with contemnors. Indeed, one could argue the practical consequence of section 6327(e) is similar in *311 nature to the provision at issue in Penn Anthracite which, in part, limited the punishments chancery courts could impose on contemnors. The problem with this analogy is that the provision at issue in Penn Anthracite authorized commitment both as an initial punishment for contempt and as a method with which to compel a contemnor to satisfy a contempt fine. Id. at 292. In plain terms, the limitation at issue in Penn Anthracite ultimately succumbed to reality.
¶ 11 I respectfully submit that once the threat of detention is taken off of the table, juvenile courts are "utterly powerless" to address dependent status offenders in contempt of court. Williamson's Case, supra at 18. Without the ability to compel compliance, juvenile courts can ask a status offender in contempt to come before the court, report to shelter care, or submit to other treatment, but it cannot compel such action. Human experience has taught us that inviting people, especially those of minority age, to alter engrained behaviors which offer the allure of instant gratification is often an invitation that is declined. The instant matter is no different.
¶ 12 It is unclear whether section 6327(3), which was passed two years after the JJDPA, was drafted with the express intent of prohibiting courts from placing status offenders in criminal contempt in secured facilities. The practical consequences of section 6327(e) in these situations, nonetheless, are sufficient to raise constitutional separation of powers issues. These consequences prevent juvenile courts of this Commonwealth from fully "provid[ing] for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of the Juvenile Act. See 42 Pa. C.S.A. § 6301, Short title and purposes of chapter, (b)(1.1) Purposes. The constitutional question, however, was not addressed before the juvenile court or this Court, is more suitable for a higher tribunal, and is best left for another day.
¶ 13 In conclusion, I respectfully urge the General Assembly to amend the Juvenile Act to include a carefully crafted "valid court order" exception to the section 6327(e) prohibition against detaining status offenders. Society's interest in treating at-risk youth demands that we give our juvenile courts a complete set of tools with which to work, and the order of law demands no less. A provision which yields negative practical consequences and raises constitutional concerns represents "idealism" at its worst.
¶ 14 It is for these reasons that I respectfully dissent from the result we have been forced to render in this case.
NOTES
[1] According to the DHS Supplemental Report, appellant attended school only six days between January 2007 and April 12, 2007, and he had attended only once within the first seven days of May 2007. Significantly, appellant's previous problems with truancy caused him to repeat the tenth grade. (Notes of testimony, 7/18/07 at 6-7.)
[2] Appellant reneged on his promise to the juvenile court and fled CYF custody because he could not be admitted into the group home of his choosing. (Notes of testimony, 7/18/07 at 3.)
[3] The juvenile court issued an order dated July 5, 2007, and filed on July 17, 2007, wherein it directed appellant to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P.1925(b). The Rule 1925(b) order granted appellant 30 days to comply. Although the appeal assigned Docket No. 1304 WDA 2007 was the only appeal pending on the date the order was entered, appellant filed Rule 1925(b) statements on August 1, 2007 and August 7, 2007, relating to Docket Nos. 1304 WDA 2007 and 1376 WDA 2007, respectively. No Rule 1925(b) statement was filed regarding the appeal at Docket No. 1377 WDA 2007.
[4] CYF declined to adopt a position or file a brief in this appeal.
[5] "A status offense is conduct which if engaged in by an adult would not be legally prohibited." In the Interest of R.B., 424 Pa.Super. 57, 621 A.2d 1038, 1042 n. 11 (1993).
[6] JJDPA is a federal act which funds the mandate that states implement several measures to protect juveniles.
[7] To the extent the juvenile court's July 18, 2007 disposition order referenced the now invalidated July 12, 2007 warrant, that portion of the order is stricken by implication.
[8] "The factors generally said to point to a civil contempt are: 1) Where the complainant is a private person as opposed to the government or a governmental agency; 2) where the proceeding is entitled in the original ... action and filed as a continuation thereof as opposed to a separate and independent action; 3) where holding the defendant in contempt affords relief to a private party; 4) where the relief requested is primarily for the benefit of the complainant; and 5) where the acts of contempt complained of are primarily civil in character and do not of themselves constitute crimes or conduct by the defendant so contumelious that the court is impelled to act on its own motion." Ashton, supra at 1202, quoting Knaus v. Knaus, 387 Pa. 370, 127 A.2d 669, 673 (1956).