J-S11017-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| AMBER BANE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANDREA BANE AND JONATHAN | : | No. 1042 WDA 2021 |
| JULIAN | : | |

Appeal from the Order Entered August 5, 2021
In the Court of Common Pleas of Greene County Civil Division at No(s):
A.D. No. 120 of 2017

BEFORE:  PANELLA, P.J., OLSON, J., and SULLIVAN, J.

MEMORANDUM BY OLSON, J.:                **FILED:  April 25, 2022**

Appellant, Amber Bane (hereinafter "Maternal Grandmother"), appeals from the order entered on August 5, 2021, which granted Jonathan Julian (hereinafter "Father") primary physical custody of the minor child, J.B. (hereinafter "Child"), who was born in September 2016.  We affirm yet remand for a limited purpose.

Father and Andrea Bane (hereinafter "Mother") are the parents of Child. On February 9, 2017, the trial court entered a custody consent order, which declared that Father, Mother, and Maternal Grandmother agreed that the three would share legal custody over Child and that Maternal Grandmother would have primary physical custody of Child.  ***See*** Custody Consent Order, 2/9/17, at 1.

On December 28, 2020, the trial court entered an order declaring that Maternal Grandmother appeared in front of the court, *pro se*, and informed the trial court that Father violated the February 9, 2017 custody consent order. Specifically, the December 28, 2020 order noted that Maternal Grandmother claimed:

> [Father] had permission of [Maternal Grandmother] to visit with his son during the Christmas holiday [and] that [Father] was scheduled to return [Child] to [Maternal Grandmother] on December 23, 2020. [Child] has not yet been returned, and [Maternal Grandmother] indicates that [Father] has left Pennsylvania with [Child] and is now located in the State of Hawaii.

Trial Court Order, 12/28/20, at 1.

The trial court further declared that, "[a]ssuming [Maternal Grandmother's] allegations . . . are true, [Father] would be in violation of the" February 9, 2017 custody consent order. *Id.* at 2. The trial court then scheduled a contempt hearing on the matter for March 19, 2021. *See* Trial Court Order, 1/6/21, at 1.[1]

On March 8, 2021, Father filed a petition for modification of custody and requested that the trial court grant him primary physical custody over Child. Father's Petition for Modification of Custody, 3/8/21, at 1-2. Father also

---

[1] After Maternal Grandmother obtained counsel, counsel filed a written petition for contempt against Father. The written petition for contempt requested that the trial court hold Father in contempt "for violating the February 9, 2017 Custody Consent Agreement by failing to return [Child] to [Maternal Grandmother] by December 23, 2020." Maternal Grandmother's Petition for Contempt, 3/9/21, at 2.

requested that the trial court grant him permission to relocate Child to Hawaii, as "Father is an active duty servicemember in the United States Army and is currently stationed in Hawaii." *Id.* at 1.

On March 19, 2021, the trial court entered a scheduling order which declared that the previously scheduled, March 19, 2021, hearing on Maternal Grandmother's contempt petition was postponed until April 19, 2021. The scheduling order declared that, at the April 19, 2021 hearing, the trial court would hear testimony concerning "all outstanding issues" in the case. Trial Court Order, 3/19/21, at 1.

On April 19, 2021, the trial court held the scheduled hearing. During the hearing, Father testified that he is 24 years old and married to a woman named Michelle Julian (hereinafter "Father's Wife"). N.T. Hearing, 4/19/21, at 11. As Father testified, he is an active duty member of the United States Army and currently stationed in Schofield Barracks Army Base, in Hawaii. Father testified that he rents a home on the military base in Wahiawa, Hawaii; the home has two-and-a-half bedrooms, one-and-a-half bathrooms, a fenced-in backyard, and a garage port. *Id.* at 20. He lives with his wife, his sister, and Child. *Id.* at 12.

Father testified that he normally works Monday through Friday and his workdays consist of the following:

> So, I wake up at five a.m. Monday through Friday, every day, and I get to work at 5:30 to show up for first formation at 6:00. And then at 6:30 we start P.T., . . . which is physical training where we go basically run, lift weights, whatever we decided to do for that day. And then we get done around

> 7:45-8:00. Depends on the day. Depends on what we are doing. And I go back home, I usually have breakfast with the kids and everything, and then I go back to work at 9:30 and I'm at work till 11:30 and we get released for lunch from 11:30 to [1:00 p.m.] . . . And then I go back to work at 1:00 and [work until] . . . 3:30 to 4:00. . . . Fridays – it's called Aloha Fridays, so we get off early every Friday at like no later than [2:00 p.m.]

*Id.* at 18-19.

During the day, Child stays at the house with Father's Wife, who receives disability payments. *Id.* at 19-20.

Father testified that Child suffers from oppositional defiant disorder ("ODD") and attention-deficit/hyperactivity disorder ("ADHD") and that Child "stutters pretty bad." *Id.* at 29-31. Father testified that Child is currently being treated by a speech therapist for his stuttering. *Id.* at 31.

As Father testified, Child refers to Father's Wife as "Momma" and "show[s] love and affection towards her." *Id.* at 38. Child calls Father's sister "Sissy" and views her as a "big sister." *Id.*

Father testified that, in September 2019, Maternal Grandmother relinquished primary custody of Child to him. *Id.* at 46. Specifically, Father testified that, in 2019, he and Maternal Grandmother were living in Georgia and were engaged in discussions regarding a change in primary custody for Child. *Id.* at 48. Father testified that, in September 2019, he and Maternal Grandmother signed a "custody agreement," wherein they agreed that Father would be the primary physical custodian of Child. *See id.* at 51-52; Father's Exhibit "J" at 2. However, the "custody agreement" was not filed in any court.

Father testified that, after he and Maternal Grandmother signed the "custody agreement," Child began staying with him. N.T. Hearing, 4/19/21, at 54. Further, Father testified that he continuously notified Maternal Grandmother of where he and Child were living and where the Army was sending him. *Id.* at 55. Father testified that he specifically informed Maternal Grandmother that he and Child were going to move to Hawaii and that Maternal Grandmother "was okay" with this fact. *Id.*

As Father testified, in July 2020, he and Father's Wife were "going through a rough spot in [their] marriage" and Maternal Grandmother asked Father if Child could stay with her. *Id.* at 60. Father agreed and Child stayed with Maternal Grandmother from July until December. *Id.* at 59-60.

Father testified that, in December 2020, he had holiday leave from the Army. He testified that he picked Child up from Maternal Grandmother's house, spent time with relatives, and then flew back to Hawaii with Child. *Id.* at 62. Father testified that, approximately two days after he was reunited with Child, he learned that Maternal Grandmother was "not pleased with [him] not returning [Child] to her" and told Father that "she had no intention on . . . giving [Child] back" to Father. *Id.* at 64.

Father testified that Maternal Grandmother wanted him to return Child to her after Father's holiday leave was over. *Id.* at 65. However, Father testified:

> Based off the documents I had and the understanding I had from legal aid . . . I was under the impression . . . [that] the original [February 2017 custody consent order] . . . was null

and void at this point [because of the un-filed, September 2019 "custody agreement" between Father and Maternal Grandmother].

*Id.* at 65-66.

Father testified that, if he were awarded primary physical custody of Child and allowed to live in Hawaii, a "fair" custody arrangement would allow for Mother and Maternal Grandmother to have partial custody of Child for "a couple weeks at a time . . . and then also [allow] for . . . some visits for them to come see us." *Id.* at 79. Father testified that he has "no concerns about [Maternal Grandmother's] residence or house" and does not believe that Maternal Grandmother consumes controlled substances. *Id.* at 101-102.

Maternal Grandmother testified that she initially took custody over Child because:

> both [Mother and Father] were unemployed, didn't have a house, a home, nowhere to take [Child], and [Mother] was moving around a lot and [Father] was with my sister. So, instead of [Child] being [dragged] around, I got custody of him, so he had a stable environment.

*Id.* at 161.

She testified that Child lived with her continuously from the time he was born until 2019 and, during that time, Father had limited contact with Child. *See id.* at 140. As Maternal Grandmother testified, she and Child moved to Georgia in 2019 and, in July of that year, made contact with Father and Father's Wife, as they were also living in Georgia. She testified that Father visited her in July 2019 and, during this visit:

> I told him if he wanted to be in [Child's] life, he can't just come once a week, once every other week, like – the baby don't know you anymore, so you need to come more often. So, he did. He was coming two, three, sometimes four days a week, and we would spend time together. We [] actually all became really close. And if we weren't at their house, they were at our house. And so, the boys were still together, and I was still with [Child], they were with [Child]. It worked out pretty good for a while.

*Id.* at 141-142.

Maternal Grandmother testified that she moved back to Pennsylvania in February 2020; when she moved, Child stayed in Georgia and lived with Father's Wife while Father was in basic training. *Id.* at 142. She testified that she left Child in Georgia because:

> I wasn't able to take [Child] to [Father's] graduation from [basic training]. He wouldn't have been able to see his dad as much. So, we left [Child] down there for a little while and that gave me time to go home, get my house ready instead of doing it with two toddlers. So, it was like a trial thing – like a vacation. He was down there. We were seeing what was going to happen.

*Id.* at 143.

Maternal Grandmother testified that, when she left Child in the care of Father's Wife, she did not intend to abandon her rights under the February 2017 custody consent order. Instead, she viewed the situation as a "trial run"

> [t]o see if [Father and Father's Wife] were able to handle [Child] or what was going to happen because [Father] was trying to get [Child] back which as him being his child, I was okay with it – him trying. But at the time, he wasn't even back with [Child] for a year after not seeing him for over two. So, . . . that's why we didn't set a date [for Father to return Child].

*Id.* at 182.

Maternal Grandmother further testified that, in July 2020, Father's Wife drove Child from Georgia to Maternal Grandmother, so that Child could stay with Maternal Grandmother. *Id.* at 144. She testified that Child was supposed to live with her, in Pennsylvania, from that point forward.

As Maternal Grandmother testified, she, Father, and Father's Wife arranged for Child to spend some visitation time with Father in December 2020. They agreed that Father would return Child to Maternal Grandmother on December 23, 2020. *Id.* at 145. Maternal Grandmother testified that, "a day or two before they were supposed to bring [Child] home," Father and Father's Wife cut off all contact with Maternal Grandmother. *Id.* at 146. As a result, Maternal Grandmother contacted the police. *Id.* at 147. Maternal Grandmother testified that Father did not permit her to have any contact with Child until March 2021. *Id.* at 148-149.

Regarding the un-filed, July 2020 "custody agreement" that Father testified was signed by both him and Maternal Grandmother – and that purportedly transferred primary physical custody of Child to Father – Maternal Grandmother testified that she did not sign the document or initial the pages. *Id.* at 154. She further testified that she never relinquished her custodial rights to Child. *Id.* at 155.

Mother also testified at the hearing and informed the trial court that she wished for Maternal Grandmother to retain primary physical custody over Child. *Id.* at 217.

On August 4, 2021, the trial court granted Father primary physical custody over Child and allowed Father to relocate Child to Hawaii. Maternal Grandmother filed a timely notice of appeal and raises two issues to this Court:

> [1.] Whether the trial court committed an error of law and abuse of discretion in failing to rule on [Maternal Grandmother's] petition for contempt against [Father] after conducting a full evidentiary hearing[?]
>
> [2.] Whether the trial court committed a gross abuse of discretion when granting Father primary physical custody where Father wrongfully removed the minor child from the jurisdiction of Pennsylvania, failing to follow the custody consent order, and continuously failed to communicate with [Maternal Grandmother?]

Maternal Grandmother's Brief at 5 (some capitalization omitted).

First, Maternal Grandmother claims that the trial court erred when it "failed to rule on" her petition for contempt against Father. *Id.* "An order of contempt is final and appealable when the order contains a present finding of contempt and imposes sanctions." *In re K.K.*, 957 A.2d 298, 303 (Pa. Super. 2008). Here, the trial court did not rule on Maternal Grandmother's petition for contempt; therefore, we do not have jurisdiction to consider the merits of any claim of "error." Nevertheless, we remand this matter to the trial court, so that the trial court may finally rule upon Maternal Grandmother's petition for contempt.

Next, Maternal Grandmother claims that the trial court abused its discretion when it granted Father primary physical custody of Child.[2]

Our standard of review regarding custody decisions is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

We have stated:

The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

_____

[2] The trial court's failure to rule on Maternal Grandmother's separate petition for contempt does not affect our jurisdiction over her appeal from the trial court's final child custody order. The child custody order was entered after a full evidentiary hearing and was intended by the trial court to constitute a complete resolution of the custody claims pending between the parties. *See* *G.B. v. M.M.B.*, 670 A.2d 714, 720 (Pa. Super. 1996) ("a custody order will be considered final and appealable only if it is both: 1) entered after the court has completed its hearings on the merits; and 2) intended by the court to constitute a complete resolution of the custody claims pending between the parties").

[W]e [have] stated the following regarding an abuse of discretion standard:

> Although we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

With any custody case decided [], the paramount concern is the best interests of the child. 23 Pa.C.S.A. §§ 5328, 5338.

\*                    \*                    \*

Section 5338 of the [Child Custody] Act provides that, upon petition, a trial court may modify a custody order if it serves the best interests of the child. 23 Pa.C.S.A. § 5338. Section 5328(a) sets forth the sixteen best-interest factors that the trial court must consider.[3]  Trial courts are required to consider **all** of the factors listed in section 5328(a) when entering a custody order.

_____

[3]  The sixteen factors set forth in Section 5328 are as follows:

(a) Factors.--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

_____

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Further, we have explained:

> Section 5323(d) provides that a trial court shall delineate the reasons for its decision on the record in open court or in a written opinion or order. Additionally, section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen section 5328(a) custody factors prior to the deadline by which a litigant must file a notice of appeal.

> In expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations. A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with section 5323(d).

*S.S. v. T.J.*, 212 A.3d 1026, 1034-1035 (Pa. Super. 2019) (quotation marks and some citations omitted) (emphasis in original).

On appeal, Maternal Grandmother claims that the trial court abused its discretion when it granted Father primary physical custody over Child because: 1) Father violated the February 2017 custody consent order when he took Child to Hawaii in December 2019; and 2) Child has resided with Maternal Grandmother "for almost his entire life." Maternal Grandmother's Brief at 11. Maternal Grandmother's claims challenge the weight of the evidence in this case. However, as the trial court ably explained, the trial court did not abuse its discretion when it granted Father primary physical custody over Child:

> As [the trial court] told the parties at [the] hearing, whatever else is true in this case, [the trial court has] a positive opinion of [Father, Father's Wife, Mother, and Maternal Grandmother] in terms of their intentions. In fact, based on the testimony of all parties, [the trial court believes] the parents made a good decision in placing [Child] with

[Maternal Grandmother] at the time of his birth. As they both indicated, back then they lacked the resources to care for [Child]. For her part, [Maternal Grandmother] stepped up when asked and did the job which the parents felt they could not. The situation, however, has changed.

While [Father] may have had an improper understanding of the legalities of the custody situation in relocating to Hawaii in light of the [custody consent order from February 2017] and the fact the Georgia order was never filed, presently he has more than competently assumed the primary parental role. Further, he now has the additional resource of his wife . . . to care for [Child].

Under Pennsylvania law, where that is the case, the burden that the [Maternal Grandmother] faces in overcoming the right of a parent to custody is a formidable one. It necessarily requires some showing by [Maternal Grandmother] that [Father] is somehow inadequate to the task of parenting [Child] at this point in time. In fact, [Maternal Grandmother] makes no such case in her presentation. Instead, she essentially contends her familiarity with [Child] is greater than [Father's] based on her longstanding relationship. On this basis, she seeks to continue to be [Child's] primary custodian. She makes no case that [Father] is somehow inadequate. Those observations aside, we turn to the custody factors as the format for further discussion.

1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

. . . [B]oth [Father] (presently) and [Maternal Grandmother] (historically) have been important persons in [Child's] life. There has also been some cooperation in the past. In fact, when [Maternal Grandmother] moved to Georgia, there was no apparent difficulty in reintroducing [Father and Father's Wife] to [Child] once everyone was in the same state. Similarly, in June 2020, when [Father] and [Father's Wife] encountered difficulties, they immediately relied on [Maternal Grandmother] and voluntarily relocated [Child] to [Maternal Grandmother] in Pennsylvania. It seems that only the more recent events of [Maternal Grandmother] keeping [Child] and

- 14 -

[Father] relocating to Hawaii on his own motion without notice to [Maternal Grandmother] ended this cooperation. Viewing the parties, [the trial court is] hopeful the resolution of this case can lead to more cooperation.

2) The present and past abuse committed by a party or member of the party's household, whether there is continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

Although there was some testimony in the case from [Father's Wife] and [the paternal mother-in-law], that [Maternal Grandmother] in isolated instances was observed to be "verbally" abusive to [Child] at times and on one occasion denied him access to the bathroom so that he soiled himself [after] which she "whaled" on him leaving a welt, there is no real pattern of abuse established on the part of anyone. This is not a major factor in the case.

3) The parental duties performed by each party on behalf of the child.

In terms of parental duties, there is no testimony that [Maternal Grandmother] did not perform these duties in an appropriate fashion during [Child's] residence with her. Similarly, [Father's] testimony, the exhibits, and the testimony of [Father's Wife] all suggest [Child] is receiving very appropriate care presently residing with [Father]. This is not a major issue in the case.

4) The need for stability and continuity in the child's education, family life and community life.

This factor greatly favors [Father]. He is the right age and has the requisite stability to ensure continuity during [Child's] minority. He also has a very interested and involved wife as additional support. . . .

5) The availability of extended family.

There is no question that since the distance between Pennsylvania and Honolulu is some thousands of miles, whatever decision [the trial court makes] will inevitably affect extended family. However, there is no testimony in the case that extended family have been particularly involved with [Child]. On the contrary, it appears that whether [Child] was with [Father] or [Maternal Grandmother], the individuals living in the home where [Child] was residing were the only people who were truly involved in [Child's] upbringing and social life – not extended family.

6) The child's sibling relationships.

This is not a significant factor in the case presently.

7) The well-reasoned preference of the child based on the child's maturity and judgment.

This is not a factor in the case presently due to [Child's] young age.

8) The attempts of a parent to turn the [child] against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

This case does not involve a parent turning the child against another parent. [Such a claim has not been made by any party in this case.] In fact, there appears to be a positive relationship between [Child] and everyone involved until recently.

9) Which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child adequate for the child's emotional needs.

Presently, [the trial court finds] that this is [Father]. While the military may require travel and changes of location, both [Father's] impressive involvement presently and the fact he

has his wife as an additional caregiver is a considerable strength. [Maternal Grandmother] has no similar support system [and Mother] is only casually involved per her own testimony and expressed no intention of involving more.

10) Which party is more likely to attend to the daily, physical, emotional, developmental, education and special needs of the child.

Again, this factor favors [Father]. While [Maternal Grandmother] was apparently successful with [Child] while he was much younger, [Father] is currently in a better position both to provide and parent going forward.

11) The proximity of the residences of the parties.

This is a powerful factor in the case with respect to the relocation. Obviously, given the distances it is not possible to keep everyone involved at the level which they (or [the trial court]) would like to maintain if they are the party who does not have primary custody. It is a factor we can only overcome to the maximum extent possible consistent with the resources of the parties.

12) Each parent's ability to care for the child or ability to make appropriate childcare arrangements.

This is clearly [Father]. [Maternal Grandmother] must act alone while she has full[-]time employment. [Father] has a non-working wife who is available to attend to any of [Child's] needs at any time he is on duty.

13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect the child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

The level [of] conflict in this case is low. The parties presented their positions in a very moderated fashion and

neither sought to generate conflict at [the] hearing. Simply put, they are looking for resolution. Notwithstanding, both [Father] relocating to Hawaii without notice and [Maternal Grandmother] keeping [Child] in calendar year 2020 beyond the understood period suggest there may be more control issues than appeared at [the] hearing. Yet, both parties appeared before the [trial] court seemingly willing to comply with any order [the trial court should] enter.

14) the history of drug or alcohol abuse of a party or member of a party's household.

There were allegations of [Maternal Grandmother] drinking alcohol excessively from several witnesses. [Father] shares these concerns.

15) The mental and physical condition of a party or member of a party's household.

There is nothing in the case to suggest a mental or physical condition of any of the parties as a significant factor.

Conclusion

In closing, in [the trial court's] judgment all the parties involved are legitimately interested in [Child]. It is [the trial court's] belief, however, that both the natural preference which a parent receives over a third party under the law and [the trial court's] discussion demonstrate conclusively [that Father] should be the primary custodian and be able to exercise sole legal and physical custody going forward.

Trial Court Opinion, 8/4/21, at 9-16 (some capitalization omitted).

Based upon the trial court's careful analysis in this case, we conclude that the trial court did not abuse its discretion when it awarded Father primary physical custody over Child. Maternal Grandmother's claims that the trial court failed to properly weigh the fact that Father violated the February 2017

custody consent order and fact that Child has resided with Maternal Grandmother "for almost his entire life" fail to amount to an abuse of discretion, especially in light of the significant evidence presented that Father and Father's Wife can financially, physically, and emotionally provide for Child and that Child's best interests would be served by Father having primary physical custody over Child.[4]  As such, Maternal Grandmother's claim on appeal fails.

Order affirmed.  Case remanded solely to address Maternal Grandmother's petition for contempt.  Jurisdiction relinquished.

_____

[4] We further note:

> In a custody contest between two biological parents, the burden of proof is shared equally by the contestants.  Yet, where the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced.  In such instances, the parents have a *prima facie* right to custody, which will be forfeited only if convincing reasons appear that the child's best interest will be served by an award to the third party.  Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the biological parents' side.

> What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.  These principles do not preclude an award of custody to the non-parent. Rather, they simply instruct the hearing judge that the non-parent bears the burden of production and the burden of persuasion and that the non-parent's burden is heavy.

***Jordan v. Jackson***, 876 A.2d 443, 449-450 (Pa. Super. 2005) (quotation marks, citations, footnotes, and corrections omitted).

- 19 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>4/25/2022</u>